# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2698

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

DUSTIN C. BASKIN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 CR 03—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED NOVEMBER 30, 2004—DECIDED MARCH 17, 2005

_____

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-Appellant Dustin C. Baskin was indicted for possession of equipment, chemicals, and materials with reasonable cause to believe they would be used to manufacture methamphetamine, in violation of 21 U.S.C. § 843(a)(6), and for manufacturing methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Baskin moved to suppress his statements to police and evidence that was seized as a result of an investigative stop of the car in which he was a passenger, but his motion was denied. Baskin then

entered a conditional plea of guilty, pursuant to FED R. CRIM. P. 11(a)(2), and was sentenced to fifteen months' imprisonment and three years' supervised release. Baskin appealed the denial of his motion to suppress. We affirm.

# I.  Background

Glen Hills County Park is a hilly and heavily wooded area in rural eastern St. Croix County, Wisconsin, pocketed with caves. On September 22, 2003, hikers in the park contacted the County Sheriff's Department to report suspicious equipment in one of the caves. Deputies who responded identified the equipment as paraphernalia associated with methamphetamine production. Since such sites can be toxic and volatile, the area was cordoned off and monitored until a specialist could arrive to inspect and dismantle the equipment. Deputies watched the site in two-hour shifts on the evening of September 22 and the morning of September 23.

Deputy Sheriff Brandie Uhan, a five-year veteran of the force with expertise in drug investigation, took the 2:00 a.m. to 4:00 a.m. shift. Uhan parked her marked squad car along a dark and isolated stretch of Rural Route 4 ("RR4"), a narrow, dirt road that provides access to the park. She waited there, within close proximity to the cave, with her engine and car lights turned off.

At 3:17 a.m., vehicle lights approached. This was the first car to come by in over five hours; none had passed since the start of Uhan's shift, and she had learned from the officer on the prior shift that no vehicles had driven by since 10:00 p.m. The car approached at 10 to 15 miles per hour, a speed which Uhan considered to be suspiciously slow. Because it was so dark out and the road so narrow, Uhan feared the approaching vehicle might run into her squad car. Uhan turned on her lights, whereupon the approaching car immediately accelerated and sped past Uhan and the cave.

This made Uhan even more suspicious, so she performed a Y-turn and pursued the accelerating vehicle down the dirt road. She had to travel at 40 to 50 miles per hour to catch up. She followed the car for half a mile to where RR4 intersects with County Road W, a paved and wider road, and signaled for the driver to pull over. The car came to a stop, and Uhan approached. Justin Johnson was in the driver's seat of the car, and Baskin was riding in the passenger's seat. Johnson explained to Uhan that they had come from "the Farm" in Emerald, Wisconsin, and were on their way out to the 128 Restaurant. Being familiar with both locations, Uhan recognized that the two had taken a very indirect route between those points. Uhan noticed immediately that Johnson appeared intoxicated, as his eyes were bloodshot and speech slurred. She also observed that Baskin appeared nervous, at one point pulling out a cigarette, placing it behind his ear, forgetting it was there, and pulling out a second one to smoke. Uhan shined a flashlight into the backseat, where she noticed two hose clamps and a broken light bulb, which she knew were evidence of methamphetamine production and use.

Uhan left both men in their car and returned with their driver's licenses to her vehicle to run past dispatch. As she walked to her squad car, Uhan glanced back and observed both men reaching beneath their seats and into the back seat, and saw Baskin fumbling with the handle of his door. Concerned, Uhan re-approached the driver's side of the car and saw a baseball bat next to Johnson that had not been there before. When asked about the bat, Johnson replied that it was "no big deal" and set it in the back seat. Uhan also noticed that Baskin had his fists clenched near his stomach. Uhan ordered Baskin to open his hands, which he did, revealing eight small, plastic packets containing a white residue. Uhan knew that such packets were commonly used for storing methamphetamine.

At that point, several deputies arrived, and the two men were removed from the car and detained for investigation. Uhan then searched the car, finding more small, plastic packets and a glass plate with a dusting of white residue. Uhan also noticed that attached to the key ring in the car's ignition was a red cap similar to those used to cap tanks of anhydrous ammonia, which she knew was used for methamphetamine production. The two men were thereupon arrested for possession of drug paraphernalia.

A federal grand jury returned an indictment charging Baskin and Johnson with one count of possessing equipment, chemicals, and materials with reasonable cause to believe they would be used to manufacture methamphetamine, and one count of manufacturing methamphetamine. Baskin moved to suppress the evidence that was seized in connection with his arrest. Following an evidentiary hearing, the magistrate judge recommended that the district court deny the motion. In its recommendation, the magistrate judge acknowledged that while "timing and location of a slow-moving car probably do not rise above the level of a hunch . . . adding evidence of flight tips the balance in favor of the stop." The district court adopted the magistrate judge's recommendation and denied Baskin's motion, explaining that its decision was based upon timing, location, and the fact that "when Deputy Uhan turned on her headlights, the car accelerated quickly." Baskin appealed the court's decision.

## II. Discussion

In considering a district court's denial of a motion to suppress, we review its legal conclusions *de novo* and its findings of fact for clear error. *United States v. McGee*, 280 F.3d 803, 805 (7th Cir. 2002).

The Fourth Amendment protects people from unreasonable searches and seizures. *See* U.S. CONST. amend. IV. However, a brief, investigatory stop that demands only a

limited intrusion into an individual's privacy is permitted under the Constitution when it is based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). So, police can conduct a so-called *Terry* stop if they have reasonable suspicion, supported by articulable facts, that criminal activity is afoot. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000). Reasonable suspicion amounts to something less than probable cause but more than a hunch. *Id.* The officer's decision to make the *Terry* stop must have been justified at its inception, and the stop must have been reasonably related in scope to the circumstances known to the officer at the time of the stop. *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996). These circumstances might include the behavior and characteristics of the person detained, as well as the experience of the officer. *United States v. Odum*, 72 F.3d 1279, 1284 (7th Cir. 1995). Ultimately, a court's determination of reasonable suspicion "must be based on commonsensical judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

Both parties agree that a defendant's mere presence in an area of expected criminal activity does not in and of itself justify an investigatory stop. *Wardlow*, 528 U.S. at 124. However, location remains relevant to our analysis, especially when combined with unprovoked flight from the police. *Id.* In *Wardlow*, the defendant was standing against a building in an area known for drug trafficking when a police squad car pulled up as it patrolled the area. The defendant fled upon spotting the police, but they caught up with him. The police conducted a brief pat-down of the defendant, which revealed a handgun. The defendant claimed that the investigatory stop violated his Fourth Amendment rights; the Supreme Court disagreed, finding instead that the defendant's evasive behavior in a high-crime area had aroused a reasonable suspicion that criminal activity was

afoot. *Id.* at 125. The Court observed, "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124 (citations omitted).

Baskin seeks to undermine the district court's reasonable suspicion analysis by challenging the notion that he fled from Deputy Uhan. First, Baskin argues that the issue of flight is not properly before this court because the district court did not rely upon a finding of flight in its denial of Baskin's motion to suppress. In so arguing, Baskin acknowledges that the magistrate judge's finding of reasonable suspicion was predicated upon evidence of flight, in combination with the timing and location of the stop. He contends, however, that the district court excised flight from its analysis in response to Baskin's objection before the magistrate judge. This argument is contradicted by the clear language of the district court's decision. The district judge stated, "I am convinced that the magistrate judge's recommendation is correct." The judge then explained why she chose to adopt the magistrate judge's recommendation: "Not only was the car proceeding slowly, it was in the vicinity of the meth lab, it was out at a time when few people are awake, let alone driving on scenic roads through country parks, and, when Uhan turned on her headlights, the car accelerated quickly." The district judge's statements concerning the approaching vehicle's sudden acceleration upon spotting Uhan's squad car, when read in conjunction with the court's unqualified adoption of the magistrate judge's recommendation, demonstrate that the district court relied upon flight as a basis for her decision. Therefore, the issue is properly before this court.

Baskin then argues that Deputy Uhan never used flight as a justification for conducting her *Terry* stop. An officer who performs an investigatory stop "must be able to point

to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Uhan testified that her suspicions were aroused by "the fact that there hadn't been a car on the road since I started the night shift . . . . [And] I thought it was strange that the car approached slowly and then accelerated." She further added that the approaching car's dramatic acceleration coincided with her turning on the lights of her squad car. A more reasonable driver, Officer Uhan opined, might have proceeded more carefully to avoid collision with her squad car. Uhan's explanation clearly contains facts—notably the approaching vehicle's suspicious acceleration upon noticing the squad car—from which Uhan could infer that the car's occupants sought to evade her. Therefore, we conclude that Uhan sufficiently articulated flight as a reason for conducting the *Terry* stop.

Finally, Baskin argues that even if Deputy Uhan articulated flight as a justification for her investigatory stop, her suspicion that he attempted to flee—and the resultant inference that criminal activity was afoot—was unreasonable. Baskin contends that Uhan's suspicion that he fled was unreasonable because the county park is not a high-crime area, and he and the driver did not avoid Uhan but proceeded directly toward her squad car, accelerating only moderately. In assessing whether an investigatory stop was reasonable, we must consider "the totality of the circumstances known to the officer at the time of the stop." *Quinn*, 83 F.3d at 921.

Deputy Uhan's suspicions were reasonable in light of the totality of circumstances. In cases involving a defendant's unprovoked flight from the police, the inference of criminality is commonly derived from the fact that the person has fled "an area of expected criminality." *Wardlow*, 528 U.S. at 124. Baskin contends that the government must produce "specific data" establishing that a location is a "high-crime area" for this inference of criminality to be drawn from the

defendant's flight. He, however, identifies no decisions by this court in support of that proposition. In fact, the only support Baskin offers is the dissenting opinion from a decision by the Ninth Circuit, *United States v. Diaz-Juarez*, 299 F.3d 1138 (9th Cir. 2002), which, needless to say, is not binding on this court. In this case, location was not the determinative factor in the district judge's analysis. However, it is highly relevant to the reasonable suspicion analysis that the approaching vehicle's acceleration occurred in such close proximity to a newly discovered methamphetamine lab in an otherwise remote county park at a time when most people are asleep. Therefore, it was appropriate for the district court to consider the proximity to the methamphetamine lab in performing the analysis.

It was also reasonable for Deputy Uhan to interpret the vehicle's sudden acceleration as evidence of unprovoked flight. Baskin argues that the speed at which he was traveling could not have been suspicious because when Uhan observed him traveling at a speed of 10 to 15 miles per hour he was in the process of negotiating a curve in a 15 miles-per-hour zone, and his acceleration coincided with the straightening of the road into a 35 miles-per-hour zone. Baskin also offers that he continued to proceed toward Uhan's squad car rather than perform a U-turn, which he submits would have been more indicative of evasion. We keep in mind, however, that behavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play. Here, the approaching car's acceleration coincided not just with the straightening of the road, but also with Uhan turning on the lights of her squad car, which revealed her presence near the cave that housed the suspected methamphetamine lab. Baskin plays down the acceleration issue, but Uhan described it as a relatively rapid increase from 10-15 miles per hour to 40-50 miles per hour. That is a substantial acceleration, especially

when it occurred on an unlit, dirt road in the middle of the night. As Uhan noted, a reasonable driver might also have proceeded more carefully upon spotting another vehicle parked on the same, narrow road, especially when that vehicle was a squad car. Uhan's suspicions about the car's sudden acceleration were reasonable. That the car continued toward Uhan does not change our analysis, especially given the uncertain feasibility of performing an abrupt U-turn on that narrow, dirt road. Proceeding quickly toward the squad car might have been the best way to put some distance between Baskin and his partner and the methamphetamine lab without drawing additional attention.

### III.  Conclusion

For the reasons stated, we AFFIRM.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*