In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2557

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RALPH WESLEY RILEY,
also known as THOMAS DANCIK,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 CR 40087—**Joe Billy McDade**, *Judge.*

———————

ARGUED MAY 30, 2007—DECIDED JULY 10, 2007

———————

Before EASTERBROOK, *Chief Judge*, and RIPPLE and EVANS,
*Circuit Judges*.

RIPPLE, *Circuit Judge.* Ralph Wesley Riley, also known
as Thomas Dancik, pleaded guilty to two counts of bank
fraud and eleven counts of attempted bank fraud, in
violation of 18 U.S.C. § 1344, and to one count of theft of
mail, in violation of 18 U.S.C. § 1708; in his plea agree-
ment, however, he reserved the right to appeal the district
court's ruling on his motion to suppress evidence. In this
court, Mr. Riley renews his arguments with respect to his
motion to suppress and also challenges aspects of his

sentence. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

On the morning of July 23, 2004, Detective Pablo Reyna of the Moline, Illinois Police Department received a report of suspicious activity at the I.H. Mississippi Valley Credit Union involving two white males and two black males, all wearing baggy shorts.[1] Other officers responded to the call at the credit union, so Detective Reyna proceeded to other area banks in search of the described individuals.[2]

Approximately one hour after the call, Detective Reyna drove through the parking lot at the Blackhawk State Bank. After exiting the parking lot, Detective Reyna observed a green Lincoln backed into a parking space in the lot of a restaurant adjacent to the bank. The engine of the car was running, and the driver was looking in the direction of the door of the bank. It appeared to Detective Reyna that the driver was waiting for someone at the bank.

Detective Reyna continued past the bank, and, in his rearview mirror, observed a man in business dress, later

---

[1] The report also provided additional details about the men such as their height and weight.

[2] Detective Reyna testified that, even if he had not received the call, he would surveil banks as part of his activities while on duty.

identified as Mr. Riley, exiting the bank. Mr. Riley was carrying something in his hands that Detective Reyna could not see clearly. Mr. Riley walked at a brisk pace to the green Lincoln and entered the passenger side of the car; the Lincoln then pulled away, and Detective Reyna followed.

After about ten blocks, the Lincoln pulled into a gas station. The car was at the station for less than a minute, during which time the driver and the passenger switched places. Detective Reyna continued to follow the Lincoln after it left the gas station. Detective Reyna also called Detective Jeff Heist to inform Detective Heist that he was following a suspicious car; specifically, Detective Reyna told Detective Heist that he believed that the individuals in the car had been involved in a bank robbery.[3]

Now in the left-turn lane, the Lincoln stopped for a red light. Detective Reyna radioed that he was going to attempt to stop the car because there was not a marked police car in the area.

While the Lincoln still was stopped at the light, Detective Reyna pulled behind the car in his unmarked vehicle and turned on his emergency lights. He approached the driver's side of the car. Detective Reyna then showed his identification and asked to see the driver's license,[4] registration and proof of insurance; Detective Reyna noted

---

[3] At no time had Detective Reyna received a report that the Blackhawk State Bank, in fact, had been robbed.

[4] The driver's license that was produced had been issued to a "Thomas Dancik," an alias Mr. Riley had been using for a number of years.

that the insurance was expired. After these documents were produced, Mr. Riley inquired why he had been stopped; Detective Reyna responded that he was investigating a possible crime and asked Mr. Riley if he had robbed the Blackhawk State Bank. Mr. Riley responded that he had not. Mr. Riley further explained that he had been to the bank on business, that he was interested in buying a building in which he desired to open a restaurant, but that the bank was too busy at the time so he had left without transacting any business.

At that point, Detective Reyna asked for permission to search the car. Mr. Riley politely refused. Detective Reyna then told Mr. Riley that he had observed the driver carrying something in his hand as he exited the bank; Mr. Riley produced a pouch with three vitamin bottles in it. Detective Reyna responded that the pouch was not what he had seen the driver carry out of the bank.

Detective Reyna then spoke to Detective Heist who had arrived on the scene and, apparently, had spoken with the passenger. The passenger had produced a driver's license that had been revoked. After consulting with Detective Heist, Detective Reyna decided to place the driver under arrest for operating a vehicle without insurance and to place the passenger under arrest for operating a vehicle without a license.

After arresting Mr. Riley and the car's passenger, Detective Reyna searched the front compartment of the car. Items uncovered during the search included eleven personal checks made payable to individuals other than Mr. Riley, his alias or his passenger, a black planner and a notebook with the names and addresses of five local banks written in it. At the time of the arrest, Mr. Riley possessed $1,956.95 in cash.

Later inquiries at the Blackhawk State Bank revealed that Mr. Riley had presented a $3,000 counterfeit check for deposit into an account held by another individual. The deposit slip had requested that $2,100 of that amount be deposited into the account and that the purported account holder receive $900 cash. Additionally, on the day prior to the incident at the Blackhawk State Bank, Mr. Riley had presented a $3,000 counterfeit check for deposit at the Central Bank in Andover, Illinois; this check also was made out to an account holder at the bank. In that instance as well, Mr. Riley "deposited" $2,100 and received $900 in cash.

## B. District Court Proceedings

Mr. Riley was charged with two counts of bank fraud, eleven counts of attempted bank fraud, all in violation of 18 U.S.C. § 1344, and one count of theft of mail, in violation of 18 U.S.C. § 1708.[5]

Shortly thereafter, Mr. Riley moved to quash his arrest and to suppress the evidence found in the green Lincoln on July 23, 2004. According to Mr. Riley, "[t]he arrest, search, and seizure in this case were made without probable cause, and were illegal and in violation of the Fourth Amendment to the Constitution of the United States." R.15 at 2.

The district court held a hearing on Mr. Riley's motion at

---

[5] Mr. Riley had stolen actual checks from a United States Postal Service collection box. Mr. Riley used the stolen checks as examples to create the thirteen counterfeit checks, which form the basis of the bank fraud counts.

which Detective Reyna testified to the above events.[6] After
hearing the testimony of Detective Reyna and argument of
counsel, the district court made the following determina-
tion:

> The circumstances of this case present[ ] a close ques-
> tion of [a] permissible *Terry* stop. As the Court under-
> stands the evidence, an experienced police detective
> with knowledge of fraud cases including bank fraud
> is on alert because he has heard that earlier in the
> morning there were complaints of suspicious persons
> from banks. And as is his routine to check out banks
> in the area, he passes by the Blackhawk bank and he
> sees a vehicle parked, you might say, facing outward
> with its motor running adjacent to the bank, which is
> suggested that that person is waiting for someone,
> in and of itself that certainly would not justify a
> police stop.
>
> At that point Detective Reyna did not take any
> action except to watch, and he sees a man rapidly
> leaving the bank in the direction of the car with the
> running motor. And he sees this man get into the car.
> That itself may not be enough for a stop. In fact, Detec-
> tive Reyna did not stop the car at that point but his
> suspicions were aroused and he continued to follow

---

[6] Prior to offering testimony concerning the events of July 23,
2004, Detective Reyna testified to his experience on the police
force. At the time of the suppression hearing, Detective Reyna
had approximately thirty years on the job; during his tenure,
he was assigned primarily to working "paper crimes which
included credit cards, forgeries, checks," etc. R.20 (Suppression
Hearing Tr.) at 3. He also had been involved in the investiga-
tion of several bank robberies over the years.

the car because his instincts suggested that something was amiss, then he sees the car stop and there is an exchange of drivers and the passenger.

Here, again, that by itself may not justify any stop, any legal stop but it is one of a series of facts that certainly would cause an experienced detective to wonder what is going on and he sees an opportunity when the car is stopped at a stoplight to go up to the car while it is stopped, exhibit his identification as a cop and ask for driver's license, registration and insurance card.

In light of everything that had transpired up to that point, the Court finds that that was a permissible temporary stop, or if you want to call it a seizure, although there has been no evidence that the car tried to drive away. But—and there is no evidence that Detective Reyna used any type of coercive force. He didn't have his guns drawn. All he showed was his detective shield to the occupants of the car. But even if one would construe that to be a seizure, it was one of which under the circumstances the Court feels was reasonable to allow the officer to make further inquiry as to that there was something to the suspicions which he had developed from the circumstances that proceeded [sic] it.

R.20 at 33-35.

After the motion to suppress was denied, Mr. Riley pleaded guilty to each count of the indictment, and the case proceeded to sentencing. The Presentence Report ("PSR") calculated Mr. Riley's base offense level at 7. However, in accordance with United States Sentencing Guideline § 2B1.1, the offense level was increased to reflect the intended loss. The PSR calculated the amount of

intended loss at $39,000 (thirteen counterfeit checks for $3,000 each), which translated into an offense-level increase of 6. Combined with Mr. Riley's criminal history category, this yielded a guideline range of 18 to 24 months.

The PSR also calculated a fine range of $3,000 to $13,250,000 under the advisory Guidelines. However, the PSR noted that Mr. Riley did not have the ability to pay any fine in addition to the restitution of $1,800. Indeed, the PSR suggested that Mr. Riley be ordered to pay the restitution in monthly installments from his prison earnings and his earnings while on supervised release.

In response to the PSR, Mr. Riley's counsel argued that the total loss should only be $1,800 because, at the time Mr. Riley was apprehended, he had negotiated only two of the thirteen checks. According to counsel, Mr. Riley had no intention of negotiating the remaining eleven checks. The remaining checks were simply "backups" in the event that Mr. Riley "decided that's probably not a good bank to go into after he saw it." R.38 (Sent. Tr.) at 17.[7]

The Government countered that the only reason that all thirteen checks were not negotiated was that Mr. Riley was caught. Counsel for the Government also argued that Mr. Riley would not have gone to the effort of creating checks based on 13 different legitimate account holders if he had no intention of negotiating them. The Government, therefore, urged that the court accept the intended loss of $39,000 as set forth in the PSR.

The court adopted an intermediate position. It believed that Mr. Riley intended to "deposit" all of the checks;

---

[7] At the sentencing hearing, Mr. Riley did not offer any testimony regarding his intentions.

however, it attributed a loss of $900 for each check, or $11,700 for all 13 checks. The amount of loss determined by the court yielded a final offense level of 11, which, when combined with Mr. Riley's criminal history category, resulted in a guidelines range of 12 to 18 months. Given Mr. Riley's criminal history,[8] his use of an alias for over twenty years to avoid arrest and prosecution, the questionable nature of Mr. Riley's claim of a change of heart and the seriousness of the offenses, the district court sentenced Mr. Riley to 18 months' imprisonment.

The court further ordered that the restitution be paid out of the $1,956.65 taken from Mr. Riley at the time of his arrest.[9] Finally, the court imposed a fine of $1,500. The court ordered that the fine be paid from the remainder of the confiscated funds and, thereafter, through monthly installments from Mr. Riley's prison earnings or income earned while on supervised release. Mr. Riley did not object to the imposition of a fine.

## II

## ANALYSIS

### A. Motion to Suppress

Mr. Riley first challenges the district court's denial of his motion to suppress. We review a district court's legal

---

[8] Mr. Riley's criminal history included convictions for bank robbery, robbery, home invasion and delivery of a controlled substance.

[9] Mr. Riley's counsel, during the sentencing hearing, had requested that these funds be used to satisfy any restitution ordered.

conclusions on a motion to suppress, including the question whether reasonable suspicion existed to justify a stop, de novo. *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003). The district court's underlying findings of fact, however, are reviewed for clear error. *Id.*

"[A] brief investigatory stop that demands only a limited intrusion into an individual's privacy is permitted under the Constitution when it is based upon 'specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion.' " *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Officers, therefore, "may conduct an investigatory stop of a person when they have a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). "Reasonable suspicion amounts to something less than probable cause but more than a hunch." *Baskin*, 401 F.3d at 791 (citations omitted).

"When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Lawshea*, 461 F.3d at 859. "Ultimately, a court's determination of reasonable suspicion 'must be based on common-sensical judgments and inferences about human behavior.' " *Baskin*, 401 F.3d at 791 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

Given these standards, we believe that Detective Reyna had a reasonable, articulable suspicion to justify the stop of

Mr. Riley's car.[10] The information in Detective Reyna's possession, as assessed by an experienced officer, supported the reasonable suspicion that Mr. Riley had committed a crime at the Blackhawk State Bank and therefore justified the stop of Mr. Riley's vehicle. Detective Reyna had observed a car in an adjacent parking lot, which was backed into its space in the lot. There was a man sitting in the driver's seat of the car, the car engine was running

---

[10] Before the district court, the Government argued that no seizure had occurred because Mr. Riley's movement was not restricted in any way; it renews this argument on appeal. According to the Government, when Detective Reyna approached the Lincoln, the car was stopped at a red light. The Government explains that the car's movement was restricted only after the light turned green and that

> it is reasonable to infer from this record that, by that time, Detective Reyna had already learned that Riley had no proof of insurance. As soon as he had identified himself, Reyna asked for Riley's driver's license and proof of insurance. Riley promptly handed over both and Reyna immediately saw that the proof of insurance card had expired.

Appellee's Br. at 23.

We do not believe that this inference fairly can be drawn from the record. There is no question that the Lincoln was stopped at a red light when Detective Reyna first approached the car. Furthermore, it is apparent that the entire encounter did not last more than a few minutes. However, at the suppression hearing, no evidence was offered with respect to when the light changed or how long the encounter lasted after the light changed. In the absence of such evidence, we cannot say conclusively that Mr. Riley was not stopped or detained by Detective Reyna.

and the driver was focused on the entrance of the bank. Detective Reyna testified that, in his experience investigating bank robberies, it was common for perpetrators to park in lots close to banks, but not in the bank parking lots. Furthermore, the fact that the Lincoln was backed into the parking space and that the driver was focused on the bank indicated to him that the Lincoln was a "getaway" car. R.20 at 8. Case law from this court notes similar behavior by individuals involved in criminal activity at banking institutions. *See*, *e.g.*, *United States v. Jocic*, 207 F.3d 889, 890 (7th Cir. 2000) ("Upon leaving the bank, Bradach entered the passenger side of his black Jeep Cherokee, which was being driven by Jocic. The jeep was backed into a parking space facing an alley about 115 feet from the doors of the bank . . . . Once Bradach got in, the jeep immediately took off through the alley."); *United States v. Arrington*, 159 F.3d 1069, 1071 (7th Cir. 1998) (noting that, with respect to two different robberies, a "black Blazer (or Jimmy) [had been] backed into a parking space in the parking lot near the bank").

Additionally, Detective Reyna had observed Mr. Riley leaving the bank quickly and holding something in his hand. Mr. Riley then entered the car, and the car drove off. Several blocks away, the driver and the passenger switched positions, further raising Detective Reyna's suspicion. Although, as noted by the district court, all of these taken separately might not justify a stop, we do not evaluate the circumstances in isolation. *See Lawshea*, 461 F.3d at 859 ("[W]e recognize that certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play."). Furthermore, these circumstances must be viewed through the lens of Detec-

tive Reyna, an experienced officer. The Supreme Court has explained that, in determining whether particular circumstances rise to the level of a reasonable suspicion, courts must take into "consideration . . . the modes or patterns of operations of certain kinds of lawbreakers," which allow "trained officer[s] [to] draw[ ] inferences and make[ ] deductions . . . that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 419 (1981). Taken together, all of these circumstances, when observed by an officer familiar with individuals involved in robbery and fraud, would lead a reasonable officer to suspect that the individuals traveling in the Lincoln had engaged in criminal activity in the bank, and, therefore, a short detention of the parties for further inquiry was justified.

**B.  Calculation of the Amount of Loss**

Mr. Riley next challenges the district court's calculation of the amount of loss attributable to his fraud under U.S.S.G. § 2B1.1. Mr. Riley claims that he should be sentenced based on an $1,800 loss, the amount of funds he received through the deposits made on July 22 and 23, 2004; he maintains that the district court's finding of an intended loss of $11,700 is not supported by the record. The district court's determination of the amount of intended loss is a finding of fact which we review for clear error. *United States v. Al-Shahin*, 474 F.3d 941, 950 (7th Cir. 2007). "In appealing a district court's loss calculation, the defendant must show that the district court's calculation was not only inaccurate but outside the realm of permissible computations." *Id.* (internal quotation marks and citations omitted). We do not believe that Mr. Riley has met this burden.

As noted above, U.S.S.G. § 2B1.1 ties a defendant's offense level to the amount of loss suffered as a result of his actions. Application Note 3 instructs that, for purposes of calculating loss, the court should employ "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, application note 3(A) (2004). Additionally, "[t]he court need only make a reasonable estimate of loss." *Id.*, application note 3(C).

Here, there was ample evidence to support the district court's determination of an intended loss of $11,700. As noted above, when Mr. Riley was apprehended, there were eleven counterfeit checks in the car. These checks were in the same format as the checks that Mr. Riley had deposited on July 22, 2004, at the Central Bank in Andover, Illinois, and on July 23, 2004, at the Blackhawk State Bank in Moline, Illinois. Additionally, the Lincoln contained a notebook with the names and addresses of other area banks. The existence of the other checks, together with the addresses of other banks, supplied sufficient evidence to conclude that Mr. Riley's scheme was not limited to the two deposits he actually made.

Mr. Riley, nevertheless, maintains that the district court should have accepted his attorney's characterization of the other eleven checks as "backups" in the event that something went amiss with his first two attempts. The district court, however, was not under any obligation to accept defense counsel's view of the evidence. Furthermore, Mr. Riley did not present any additional evidence to support this factual theory. There was no testimony that Mr. Riley had approached other banks, but had aborted plans to deposit checks there; nor was there evidence that Mr. Riley had entered the scheme with the purpose of obtaining a limited amount of funds, for

instance, for satisfying a specific debt. Given the evidence before the district court, $11,700 was a reasonable estimate of intended loss.

## C. Imposition of a Fine

Mr. Riley next maintains that, under the circumstances presented here, the district court erred in imposing a fine. Because Mr. Riley did not object to the imposition of the fine at sentencing, we review the court's decision to impose a fine only for plain error. *United States v. Isienyi*, 207 F.3d 390, 393 (7th Cir. 2000).

Mr. Riley submits that, because the PSR determined that he did not have the present ability to pay a fine, the district court's imposition of a fine violated both U.S.S.G. § 5E1.2(a)[11] and 18 U.S.C. § 3572.[12] However, the PSR failed to acknowledge the $1,956.65 that was taken from Mr. Riley at the time of his arrest and that Mr. Riley's counsel had urged the court to use those funds to satisfy the restitution owed. After the restitution was satisfied, Mr. Riley still had approximately $150 that could be applied towards a fine. The court realized that, at the time of sentencing, these were the only funds available to Mr. Riley. The court, therefore, imposed a below-guidelines fine to be satisfied through the use of these residual funds

---

[11] U.S.S.G. § 5E1.2(a) provides: "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."

[12] 18 U.S.C. § 3572(a) states that, "[i]n determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a)—. . . the defendant's income, earning capacity, and financial resources . . . ."

and through Mr. Riley's future wages, earned either while in prison or while on supervised release.

The district court's approach finds support in our case law. In *United States v. Isienyi*, 207 F.3d 390 (7th Cir. 2000), the district court had adopted the PSR's findings that the defendant did not have any present ability to pay a fine, but nevertheless had ordered the imposition of a below-guidelines fine to be paid out of the defendant's earnings in prison. The defendant argued on appeal that "the court's adoption of the PSR finding that Isienyi is not presently able to pay a lump sum fine and is not able to pay 'on an installment basis at this time' is irreconcilable with the sentencing court's finding that a fine was appropriate." *Id.* This court disagreed:

> [T]he sentencing court's adopting of the PSR finding that Isienyi is unable to pay "on an installment basis at this time" does not logically preclude a finding that, although Isienyi might not be able to afford a fine within the Guidelines range, he could afford a substantially lower fine, especially one based on future earnings over the course of his prison term and, if necessary, during his period of supervised release. We have previously upheld the authority of sentencing courts to order that imposed fines be satisfied by withdrawing money from an inmate's prison earnings. Based on the PSR findings with regard to Isienyi's financial condition, the sentencing court departed downward substantially from the Guidelines range, ordered that Isienyi pay the fine imposed through the [Inmate Financial Responsibility Program], and waived interest on the fine and the costs of incarceration and supervision. We find no plain error in the court's decision.

*Id.* at 593-94.

Here the advisory guidelines fine range was $3,000 to $13,250,000. Recognizing Mr. Riley's limited means, the district court imposed a fine below this range, as did the district court in *Isienyi*. Also, like the district court in *Isienyi*, the district court here waived any interest on the fine and ordered that the fine be paid, in large part, out of prison earnings. Consequently, the district court's order acknowledged Mr. Riley's financial state and assessed a fine commensurate with his ability to pay. The district court's imposition of a limited fine under these circumstances was not plain error.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*