In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 07-1132 & 07-1152

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTONIO FIASCHE and ANTONIO VITAGLIANO,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 765—**David H. Coar,** *Judge.*

———————

ARGUED FEBRUARY 15, 2008—DECIDED MARCH 21, 2008

———————

Before FLAUM, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Two Antonios—Vitagliano and Fiasche—entered conditional guilty pleas to charges that they conspired to possess, with intent to distribute, various controlled substances, namely, methylenedioxy-methamphetamine (MDMA or ecstasy), methylenedioxy-amphetamine (MDA), and marijuana. They now appeal their convictions, arguing that their motions to suppress evidence were wrongly denied. We start with the facts.

Sometime during the last week of August 2005, a fellow named Lars Bjerga was arrested, somewhere in Kentucky,

with a lot of marijuana. Like many people caught in his sort of jam, he decided to roll over and spill the beans on others involved in the illicit drug business. On September 2, 2005, a DEA agent in Louisville called a DEA agent in Chicago (Jennifer Traud) and reported to her what was learned from Bjerga.

According to the information received, Bjerga had, a week or so before his arrest, delivered $134,000 in drug money to "Tony" who lived in a white brick house with an attached garage, a fenced-in backyard, and a gazebo. The residence was in the vicinity of Lawrence and Maria Streets in Chicago. According to Bjerga, "Tony" and another man were trafficking drugs out of the residence and were going to be taking some $500,000 in drug money from Chicago to New York either on September 2 (the very day Agent Traud received the call) or the following day. The trip to New York would be either in "Tony's" black Lexus or a rental car.

Bjerga also provided two phone numbers, one for Tony's "house phone" and a second for his "dope phone." Agent Traud soon learned that the "dope phone" was a pre-paid cellular phone[1] with no subscriber information. The "house phone" was registered to Antonio Fiasche, at 4738 North Maria Court in Chicago, Illinois. The address matched, to a tee, the description of a house "in the vicinity" of Lawrence and Maria Streets.

With this information in hand, the DEA sprang into action, setting up surveillance of "Tony's" house on North

---

[1] Those who watch the acclaimed HBO hit series, *The Wire*, know that these phones (usually called "burners") are difficult to trace and a favored tool of drug dealers.

Maria. Shortly after arriving there, around 12:30 p.m., the agents saw a black Lexus, with who would later be identified as Antonio Fiasche at the wheel, drive off. The Lexus made two mundane stops and returned home an hour later, around 1:30 p.m.

When Fiasche returned, another car was parked in the driveway—a silver Chevrolet Malibu—which had arrived approximately 15 minutes earlier. A man (later identified as Vitagliano) exited the car when it arrived, opened the garage door using an electronic security keypad, and entered the house. At around 1:45 p.m., Vitagliano left the house carrying a white box and a brown bag. His hold on the box and bag was rather odd, as he carried them "in his hands like he was carrying a cake." Vitagliano placed the box and the bag on the passenger side of the Malibu and drove away, heading east on Lawrence Avenue. Several agents, in separate cars, followed.

After following Vitagliano for some time, one of the surveillance officers pulled next to Vitagliano's Malibu. The agent noticed that Vitagliano appeared to be talking on a silver Motorola "Razr" cellular phone.[2] This led the agents to be concerned that Vitagliano may have discovered that he was being followed and alerted Fiasche to the fact that the house might be under surveillance. Following this encounter, according to testimony found to be credible by the district judge, Vitagliano began "[w]eaving in and out of traffic at a high rate of speed," in an apparent attempt to evade surveillance. Based on these

---

[2] Although there is no other record of a phone call from Vitagliano's Motorola Razr phone, Vitagliano testified that he had made a call on another cell phone during his drive. Phone records show that the call was made at 1:50 p.m.

observations—coupled with the fact that Vitagliano had left what they thought was a drug house at 4738 North Maria only moments ago carrying two packages—the agents decided to make an investigatory stop.

At 2 p.m., some 15 minutes after Vitagliano left the Maria Street residence, the agents activated their lights and sirens and stopped the Malibu. The agents then confronted Vitagliano, told him he was observed leaving the Maria Street residence, and that they were conducting a drug investigation. The agents patted Vitagliano down for weapons and asked for permission to search the Malibu. He consented. The search turned up 107 MDA tablets and 157 MDMA tablets in the bag Vitagliano carried from the Maria Street residence. The box he carried contained a Hewlett Packard palm pilot.

While all this was going on, surveillance on the Maria Street residence continued. Soon after the drugs were found in Vitagliano's car, agents staked out at the Maria Street residence were told about the hit. They were also told that Vitagliano had made a cell phone call while under the agents' watch and that someone in the house (Fiasche) may have been tipped off. Based on this information, the agents decided to approach the house to try to do a "consent search."

Around 2:20 p.m., Agent Traud and others, Supervisor Walters, Officer Arthur, and Special Agent Emilia Fernandez among them, approached the front door of 4738 North Maria. Officer Arthur testified that he was wearing a bullet-proof vest with "police" symbols on the front and back. The agents knocked on the door several times. After several knocks, Officer Arthur—who was positioned to the side of the door with a bay window behind him—saw the blinds move and heard someone

yell "hold on," or words to that effect. When Officer Arthur looked in the bay window, he saw a man running down the hallway, covered only with a white towel.

At this time, Agent Timothy Oko was standing on the side of the house to ensure no one fled from the side door. Right around the time the agents at the door first knocked, Agent Oko heard a loud "swishing sound" from the back of the house. Agent Oko, a moment later, "heard a flushing sound coming from a [bathroom] window . . . next to th[e] patio door." At that point, Agent Fernandez entered the backyard and Oko advised her that "somebody's flushing the toilet" and requested that she alert the agents at the front door. Between 30 seconds and a minute later, Oko heard a second flush. At that point, Agent Oko "believed that somebody was destroying evidence in the residence." Moments later, Agents Traud and Walters joined Oko in the backyard and the three agents entered the house through the patio door with their weapons drawn. Once inside, Agent Walters let Officer Arthur and Agent Fernandez in through the front door.

The agents initially cleared the kitchen area and then proceeded to secure the rest of the main floor. When securing the house, the agents noticed a "strong odor of marijuana." In the bathroom next to the master bedroom area (where Agent Oko had earlier heard the flushing sounds), agents saw "pills scattered all over the floor . . . a large duffle bag with pills . . . [a] heat sealed bag that was open and empty laying on the ground, along with . . . additional multiple bags containing small pills inside that duffle bag." Pills were also in the toilet. The agents secured Fiasche who, after being told what they were investigating, signed a consent to search

form. The search that followed turned up over 25,000 MDMA (ecstacy) pills, MDA, and marijuana.

The evidence seized from Vitagliano's car and Fiasche's house was ruled admissible by the district court (Judge David Coar) after a hearing on their motions to suppress. The denial of the motions, which preceded the defendants' guilty pleas, is the only matter of concern on this appeal.

The defendants' brief, in its "Summary of Argument" section, is "creative." Here, word for word, is what it says about the search of Fiasche's house:

> The government's suppression testimonial cache consisted of nothing more than rank speculation and quantum leaps-of-faith as putative justification for its intrusion into constitutionally protected privacy zones (curtilage/home). An experienced, well-trained and hopelessly creative federal agent raided Fiasche's home based on a charade—his purported hearing of an unexplainable "swishing" sound. And, to boot, seeing nothing . . . the same agent perpetuated the constitutionally infirm intrusion by walking up four or five patio stairs (within Fourth Amendment protected area) which permitted his hearing of "flushing" sounds.

> If the court please, that dearth of evidence, [even] taking into account the seizure of a small quantity of Ecstacy (several miles from the home), failed to provide Probable Cause *and* Exigent Circumstances supporting the breach into Fiasche's backyard and home. Accordingly, the district court erred in rejecting Fiasche's suppression importunings.

The defendants' summary regarding the stop of Vitagliano's car is less colorful so we will not repeat it here. But we will start with that search after briefly noting the standard of review which governs the case.

We review a district court's legal conclusions on a motion to suppress, including the question whether reasonable suspicion existed to justify a stop, *de novo*, while findings of fact are reviewed only for clear error. *United States v. Riley*, 493 F.3d 803 (7th Cir. 2007). Mixed questions of law and fact, including whether exigent circumstances exist, are reviewed *de novo*. *United States v. Richardson*, 208 F.3d 626 (7th Cir. 2000). Because the resolution of a motion to suppress is almost always fact-specific, we give special deference to the district judge who heard the testimony and observed the witnesses at the suppression hearing. And with respect to witness testimony, "determinations of witness credibility can virtually never be clear error." *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) (internal quotations marks and citations omitted). Lastly, arguments advanced for the first time on appeal are reviewed only for plain error.

Vitagliano argues, weakly we think given the facts of this case, that the agents lacked "reasonable suspicion" when they directed his car to a stop. "Reasonable suspicion," of course, lies in an area between probable cause and a mere hunch. Its existence is discovered by common sense, as the Supreme Court explains:

> Reasonable suspicion is a less demanding standard then probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from informa-

tion that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). Reasonable suspicion does not deal with hard certainties, and "behavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play." *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005).

Armed with the information provided by Bjerga, which so far checked out to be accurate, and their own observations of the odd way Vitagliano carried the box and bag from the house, the agents, employing even a modicum of common sense, had reasonable suspicion to conclude that something was rotten in Denmark when Vitagliano's car sped up a bit just prior to the stop. A *Terry* stop (*Terry v. Ohio*, 392 U.S. 1 (1968)) was clearly justified. And because Judge Coar credited the agents' account of how Vitagliano was driving over the contrary testimony offered by Vitagliano, we conclude that the motion to suppress was properly denied.

Vitagliano's other claims, that the pat-down search was improper and that his consent to search the car was involuntary (issues he didn't quite raise in that form in the district court and are, therefore, limited to plain error review), are without merit. For one thing, the pat-down yielded no weapons or drugs and was a permissive ingredient of this valid *Terry* stop. Vitagliano's argu-

ment about his consent to search, resting as it does on the claim that the stop itself was not supported by reasonable suspicion, collapses when the stop is found to be justified.

Turning to the entry into Fiasche's house, we start with the unremarkable observation that warrantless entries into private homes, although per se unreasonable under the Fourth Amendment, are subject to specific exceptions. *Mincey v. Arizona*, 437 U.S. 385 (1978). And one, the exigent circumstances exception, provides that a "warrantless entry by criminal law enforcement officials may be legal where there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). The government bears the burden of proving that its agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless entry into the defendants' residence. *United States v. Foxworth*, 8 F.3d 540 (7th Cir. 1993).

Here, we think the agents had more than enough probable cause to believe that drugs—notably Ecstasy tablets based on the Vitagliano stop coupled with the information from Bjerga—were inside the home. The agents also reasonably concluded (1) that Vitagliano may have alerted Fiasche that his car was being followed, (2) that Fiasche might well want to rid the house of drugs if Vitagliano did not return, (3) that Fiasche, after seeing agents in police vests at the front door, bolted down the hallway after yelling "hold on," and (4) that Agent Oko hearing "flushing sounds" all support Judge Coar's finding that exigent circumstances justified the entry into the home. Given these circumstances, time did not permit seeking out a judge and trying to obtain a search warrant which would, of course, easily have been issued had time not been of the essence.

And had the agents waited outside for an hour or so while a search warrant was applied for and obtained, it is certain here that the Chicago sewage system would have been in ecstasy after receiving some 25,000 pills flushed down the toilet from the house at 4738 North Maria Court.

The motions to suppress were correctly denied and the judgments of conviction are AFFIRMED.