NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Argued January 27, 2009
Decided February 9, 2009

**Before**

RICHARD A. POSNER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 08-2006

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Western Division. |
| *v.* | |
| | No. 07 CR 50037-1 |
| DeMARIO FLEMMING, *Defendant-Appellant*. | Frederick J. Kapala, *Judge*. |

**ORDER**

Daniel Cruz, a Rockford, Illinois, police officer, encountered DeMario Flemming while investigating a late-night complaint about an SUV being driven through residential yards in a high-crime area. Flemming admitted driving on the lawns but, according to Cruz, did not cooperate with the investigation. Cruz frisked Flemming and found a gun after he noticed that Flemming held his right hand awkwardly inside his jacket as if he were holding something and told his companion to "be cool" as they passed the officer. Flemming moved to suppress the gun in the district court, arguing that the initial stop was

unjustified and that it was unreasonable for Cruz to suspect he posed a threat. The district court denied the suppression motion, and Flemming entered a conditional guilty plea to possessing a gun as a felon. *See* 18 U.S.C. § 922(g)(1). We affirm.

Officer Cruz testified at the suppression hearing that on February 15, 2007, at 10:30 p.m., he responded to a 911 call from a resident of 1409 Green Street, who reported that a maroon Chevrolet Blazer had been driven through several yards in the neighborhood. Cruz drove by the house and saw tire tracks in the snow through the yards of 1409 and the neighboring two-family house, 1417 and 1419, but no vehicles in the immediate area matched the description. As Cruz turned off Green Street at the end of the block, a maroon SUV, a GMC Yukon, passed him and turned onto Green Street towards the complaining residence. Cruz saw the Yukon pull into the driveway at 1409, and he turned his car around to follow. By the time Cruz pulled up to the curb in front of 1409, Flemming and a female passenger, Jordan Cain, had exited the SUV.

Flemming and Cain started down the driveway toward Officer Cruz and the sidewalk that paralleled the street, and as they approached, Cruz asked why they had driven through the yards in the neighborhood. According to Cruz, Flemming responded, in essence, that he owned all the yards in the neighborhood and could drive through them. Cruz believed this was a lie because he was familiar with the area and knew that different families lived in the houses. Flemming and Cain continued walking down the driveway. Cruz testified that he noticed that Flemming had his right hand inside his jacket, up around his breast pocket. Cruz noted that it looked like Flemming was holding onto something inside his jacket and his arm didn't sway as if he were walking normally. In addition, although it was cold and Flemming was not wearing gloves, he put only one hand in his jacket. As Flemming and Cain neared Cruz, Flemming grabbed Cain's arm and told her, "Be cool."

After the two had turned onto the sidewalk and passed Officer Cruz, he told Flemming to stop and put his hands in the air because, he explained, Flemming's actions "were suspicious due to the area." Flemming complied. At that point Officer Chris Jones arrived, and Cruz frisked Flemming, finding a gun with two spent rounds in his coat pocket. Cruz testified that he had heard Flemming, who was cuffed in the squad car, say to other officers something like, "Hey, Posely. I carry a .357. You know how I am. I've been shot 12 times."

Traci Coyne, Flemming's girlfriend, testified on his behalf and said that she saw what happened while waiting for him outside 1417 Green Street in a parked car. By her account, the police approached Flemming once he exited the Yukon, handcuffed him, and only then asked if he had driven over the lawns. She said that he was frisked immediately.

And, Coyne continued, Flemming told Officer Cruz that he did not drive on the lawns and explained instead that he lived at 1417 and parked on the lawn behind the house. On rebuttal, two police officers denied seeing Coyne at the scene and denied her version of events.

The district court credited the police officers over Coyne. The court concluded that Flemming was seized when he walked past Officer Cruz and was ordered to stop, but that the stop was justified because driving a vehicle through yards could constitute reckless driving, reckless conduct, or disorderly conduct. The court also held that the frisk was justified because Cruz reasonably could have concluded that Flemming "had his right hand upon a concealed weapon" and did not want Cain "to say or do anything that could alert the police to the presence of the weapon." The court further noted that, although Flemming argued that putting a hand inside a coat pocket is ordinary behavior on a cold night, "the test is whether Cruz had reasonable suspicion that defendant was armed and dangerous, not whether there was also a plausible explanation for the suspicious behavior."

On appeal Flemming contests whether Officer Cruz had reasonable suspicion to frisk him. According to Flemming, driving on lawns is not an offense typically associated with guns, putting an ungloved hand inside a jacket in February is not unusual, and whatever suspicion Cruz might have had was dispelled when he immediately complied with the officer's request to remove his hand from his jacket. Flemming, who focuses on persuading the court that putting a hand in his jacket was not suspicious, concedes that the movement or placement of a hand can be a factor in determining reasonable suspicion, but he argues that in cases where that factor was significant the officer knew other information about the suspect suggesting a connection between the hand movement and a potential weapon. The government responds that Cruz did have other information: it was late at night in a high-crime area, Flemming had given evasive answers to Cruz's questions, and he had grabbed Cain's arm and cautioned her to "be cool."

We review a determination of reasonable suspicion de novo and the underlying findings of fact for clear error. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008). A police officer may conduct a protective frisk during an investigatory stop when articulable and particularized facts create a reasonable suspicion that the subject poses a threat to the safety of the officer or others. *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *Jewett v. Anders*, 521 F.3d 818, 825 (7th Cir. 2008). We look at the totality of the circumstances, not at each of the officer's reasons in isolation, when determining whether an officer had reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008). Presence in a high-crime area is one pertinent circumstance, *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002), as is the suspect's behavior, including evasive answers when questioned, *Cady v.*

*Sheahan*, 467 F.3d 1057, 1061-62 (7th Cir. 2006). In addition, behavior that might have an innocent explanation can give rise to reasonable suspicion depending on the context. *United States v. Fiashe*, 520 F.3d 694, 697 (7th Cir. 2008). The test is objective and looks to whether the information the officer knew at the time would make a reasonable officer suspicious. *United States v. Barnett*, 505 F.3d 637, 639-40 (7th Cir. 2007).

In this case, it was reasonable for Officer Cruz to conclude that Flemming had his hand in his jacket to conceal a gun rather than to keep his hand warm. A reasonable officer would be on the lookout for signs of a weapon given that Cruz was responding to a trespass serious enough to warrant a 911 call and he began the stop alone at 10:30 p.m. in a high-crime area. Furthermore, Flemming's SUV matched the description that the caller had given, and he all but admitted he was the culprit. In addition, Flemming seemed to be attempting to evade the officer, first, by walking past the officer without stopping and, second, by cautioning Cain to avoid drawing attention to them. Cruz had not yet finished his investigation and was not about to let Flemming go away without further questions, and so it was reasonable to frisk him to insure his safety before continuing the investigation. *See United States v. Rideau*, 969 F.2d 1572, 1574-76 (5th Cir. 1992) (en banc) (upholding frisk of man suspected to be intoxicated in public because he was in a high-crime area at 10:30 p.m., did not give police his name, appeared nervous, and backed away).

Flemming cites two cases for the proposition that hand movements alone cannot provide reasonable suspicion to believe that a suspect is armed. In the first, *United States v. Mattes*, 687 F.2d 1039, 1041 (7th Cir. 1982), the defendant stood up, turned away, and moved his hand toward his waist when police entered the bar where he was. We concluded that the defendant's movement, coupled with his resemblance to a suspect in a recent shooting, provided the officers with reasonable suspicion to frisk him. *Id.* In the second decision, *United States v. Thomas*, 512 F.3d 383 (7th Cir. 2008), the police saw a passenger in a van stopped by police "reach briefly into his left jacket pocket with his right hand, without removing anything" and decided to frisk him *Id.* at 386. But the police also knew the defendant and suspected that he dealt drugs out of that van and may have carried a handgun during drug deliveries. *Id.* at 385-86. In both cases we held that the officers's inferences that the defendants' movements suggested gun possession were reasonable because the officers had prior knowledge that linked the defendants to guns. *See Thomas*, 512 F.3d at 388; *Mattes*, 687 F.2d at 1041.

Flemming argues that his case is more like *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000). In *Burton* four police officers were serving outstanding warrants when they asked Burton, who was standing at a pay phone, for identification. *Id.* at 526. He ignored their repeated requests and also refused to take his right hand out of his coat pocket, which made one officer "uneasy." *Id.* An officer reached into Burton's pocket and grabbed his

right hand.  *Id.*  Burton resisted; the officers wrestled him to the ground, and he attempted to fire a gun at them, but it jammed.  *Id.*  The Fourth Circuit held that the officers were not permitted to frisk Burton because they had no reason to believe that Burton was involved in criminal activity to justify a nonconsensual stop.  *Id.* at 527-28.  Without reasonable suspicion that criminal activity may be afoot, the court held, an officer cannot conduct a protective search.  *Id.* at 528.

Flemming argues that his case is more like *Burton* than *Mattes* or *Thomas* because Officer Cruz knew nothing about him that would connect him to a gun.  But just because the officers in *Mattes* and *Thomas* had specific information linking the suspected crimes to guns does not mean that officers can fear for their safety only when investigating such crimes.  *Burton* is also inapposite because the defendant there did nothing to attract the officers' attention in the first place, and so they had no right to insist that he talk to them. Here, Cruz did have lawful cause to stop Flemming and, in fact, would not have been doing his job if he had let Flemming walk away before the investigation ended.

AFFIRMED.