In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-4240

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES A. DRAKE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 03 CR 83—**Theresa L. Springmann**, *Judge.*

ARGUED JUNE 14, 2006—DECIDED AUGUST 8, 2006

Before BAUER, MANION, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury found James Drake guilty of possession of a firearm by a felon, 18 U.S.C. § 922(g)(1), and the district court sentenced him before the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), to 103 months' imprisonment and 3 years' supervised release. Drake appeals, arguing that the gun should have been suppressed and that the court committed plain error when it instructed the jury regarding his two prior felony convictions. He also argues that his case should be remanded under *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005). We affirm Drake's conviction, but order a limited remand to determine whether the court would have

given Drake the same sentence under an advisory Guidelines regime.

**I.**

The Fort Wayne Police Department received an emergency 911 call on August 22, 2002, reporting that two groups—four black men in a Cadillac and two women in a LeSabre—were involved in a disturbance and that each group had a gun. The caller, who used a cellular telephone and was watching the events develop from a nearby car, witnessed the occupants exit their vehicles and reported that one of them "pulled a gun on my son-in-law." She then saw the two groups drive away and described the cars, the occupants, and their location, and asked the 911 operator if police had been sent. Detective Chad Wagner and Trainee Officer Jessica Melzoni were dispatched to the scene. The transcript of the 911 call shows that the caller was then asked her name, and that she responded: "Police coming down the street. My name is Linda Williams . . . ." Two minutes after they first received the dispatch, Wagner and Melzoni observed and stopped a Cadillac near the location provided by Williams. A third officer, James King, arrived shortly after the stop and assisted Wagner and Melzoni. The officers recovered a revolver from the floorboard beneath the feet of Drake, the driver.

Drake moved prior to trial to suppress the gun. He argued that the 911 caller was "anonymous" when she provided the information relied on by the officers, and that her call therefore lacked the indicia of reliability necessary to initiate the stop. Detective Wagner testified at a hearing on Drake's suppression motion that, after stopping the Cadillac, he approached it from the passenger side and, consistent with the description provided by the 911 caller, saw that the vehicle had a temporary paper license plate. Officer King testified that the officers, fearing that one of the

occupants was armed, ordered the four black men in the vehicle to place their hands on the seats or dashboard. King further testified that while opening the driver's door he saw a .357 revolver on the floorboard beneath Drake's feet. The four men were removed from the vehicle, and the officers then identified Drake as the driver. A second gun was also found, but Drake was charged with possessing only the gun at his feet.

The district court, distinguishing *Florida v. J.L.*, 529 U.S. 266 (2000) (holding that uncorroborated anonymous tip was insufficient to justify an investigatory stop of individual suspected of possessing a gun), denied Drake's suppression motion. The court first noted that the caller was not wholly anonymous because she had identified herself as the mother-in-law of a man who was being threatened with a gun by the occupants of the vehicles. More importantly, though, the court thought it significant that the caller was not only providing a tip, but also reporting an ongoing emergency. The court reasoned that the caller's lack of true anonymity, the need for the police to respond immediately to the emergency she reported, her proximity to the scene of the emergency, and the fact that her call was being recorded were all factors that increased the probable reliability of the report and thus gave the officers reasonable suspicion to stop the Cadillac based on the call. And having concluded that, the court also held that the officers were entitled to remove the suspects from the car, which led to the discovery of the gun in plain view.

At trial Detective Wagner testified that Drake said at the time of the stop that the gun belonged to his sister, and that he had taken it from her so that she would not get in trouble. Special Agent Sean Skender of the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that he, along with Agent John Phinney, also interviewed Drake. According to Agent Skender, Drake told them, after receiving the *Miranda* warnings, that the gun belonged to his

fellow passenger, Scott Brewer. Drake explained to the agents that he had gone to his sister's house, where she had been involved in an altercation with an unnamed man. After Drake left her house he was stopped by the police. He indicated to Skender that his sister had told him to tell the police officers that the gun was hers, but he did not explain how his sister could have known that he would be stopped by the police, or that a gun allegedly belonging to another of the Cadillac's passengers would be found at his feet.

Only Drake testified in his defense. He admitted that he was a convicted felon, but disclaimed taking responsibility for the gun at the time of the stop. To the contrary, he testified that he did not know who the gun belonged to. He also testified that the officers did not mention the gun in the Cadillac until after they had removed him and the three passengers. And, he denied telling Agent Skender that the gun belonged to Brewer. During cross-examination Drake admitted having been convicted of felonies in March 1995 and August 1998. He also testified that he did not tell Skender that his sister encouraged him to attribute the gun to her.

## II.

Drake raises three issues on appeal. First, he argues that the district court should have suppressed the gun because, he contends, the information provided by the 911 caller was unreliable. Second, he suggests that the court erred by instructing the jury that evidence of a stipulated prior conviction could be considered with regard to all of the elements of § 922(g)(1), rather than as to felon status only. Finally, he argues that the district court erred in applying the Sentencing Guidelines as mandatory even though he did not object, and that as a consequence he is entitled to a limited remand under *Paladino*.

## A. Admission of the Gun

Though both Drake and the government—as well as the district court—approach the admission of the gun from the supposition that the police acted on an anonymous tip, their arguments are based on an incorrect reading of the 911 transcript. When Williams called to report an ongoing emergency, the 911 operator first collected the information necessary to promptly dispatch the police and only then asked Williams to identify herself. Williams identified herself to the 911 operator the very first time she was asked for her name. Indeed, Williams gave her name in the same breath that she told the operator that she saw the police coming down the street. According to Detective Wagner, only minutes passed from the time the 911 operator first relayed the description of the suspects to the time the Cadillac was stopped. When law enforcement officers are in communication with one another, the question whether they possess reasonable suspicion for a stop turns on their collective knowledge, *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000), and thus it is incorrect to describe the police as having acted on an anonymous tip in this case. Here, the police relied on Williams's contemporaneous eyewitness report of an emergency situation. Williams may have been an informant of untested reliability, but she was not anonymous. Thus, this case is not governed by *Florida v. J.L.*

Nevertheless, the stop of the Cadillac was justified only if Williams's 911 report of an emergency situation provided the police with reasonable suspicion. *See United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005); *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). We hold that it did. Officers may conduct an investigatory stop of a vehicle if articulable facts support a reasonable suspicion that criminal activity is afoot. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Baskin*, 401 F.3d at 791. Here, we recognize the

particular duty of police officers to speedily respond to emergency situations reported by individuals through the 911 system. *Cf. United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) ("A 911 call is one of the most common—and universally recognized—means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help. This fits neatly with a central purpose of the exigent circumstances (or emergency) exception to the warrant requirement, namely, to ensure that the police or other government agents are able to assist persons in danger or otherwise in need of assistance."); *United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004) ("Police delay while attempting to verify an identity or seek corroboration of a reported emergency may prove costly to public safety and undermine the 911 system's usefulness. . . . The Fourth Amendment does not require the police to conduct further pre-response verification of a 911 caller's identity where the caller reports an emergency. Accordingly, an emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality.") Even in the case of anonymous callers, two of our sister circuits have afforded eyewitness 911 reports of ongoing emergency situations the same treatment. *See Anthony v. City of New York*, 339 F.3d 129, 136-37 (2d Cir. 2003) (anonymous 911 call placed from verifiable address justified warrantless entry based on exigent circumstances, where caller "expressed an immediate risk of harm to herself"); *United States v. Holloway*, 290 F.3d 1331, 1338-39 (11th Cir. 2002) ("[W]hen an *emergency* is reported by an anonymous caller, the need for immediate action may outweigh the need to verify the reliability of the caller."). We therefore presume the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies herself. It is enough in this case that Williams's 911 call reported an immediate threat to public safety and that she provided

sufficient details to allow the officers to identify the suspects. The police, when they located the Cadillac Williams described, were not confronted with any reason to doubt her report, and thus the presumption remained intact. Requiring further indicia of reliability would only jeopardize the usefulness of the 911 system and the ability of officers to prevent further danger to the public.

## B.  Jury Instruction Regarding Prior Convictions

Drake next argues that the district court's instruction to the jury regarding the appropriate use of evidence of his prior conviction was clearly erroneous. Instruction 11 informed the jury:

> You have heard evidence that the Defendant was convicted of a felony crime punishable by imprisonment for a term exceeding one (1) year. You may consider this evidence in your determination of the *elements* of the gun charge in the indictment. You have also heard evidence that the Defendant was convicted of a crime in 1995. You may also consider this evidence in deciding whether the Defendant's testimony is truthful in whole, in part, or not at all. You may not consider this evidence for any other purpose.

(emphasis added). A prior felony conviction, he argues, can be used only to prove a defendant's status as a felon (the first element of the § 922 charge), not to show he possessed the gun (the second element of the charge), and thus the use of the plural 'elements' was erroneous. Drake concedes that he never objected to this instruction at trial, but he blames the court for that omission: "The district court certainly was instrumental in leading the defendant to think that there was nothing to object to, because this instruction was to be rewritten by the court after extended discussion as to the charges required." But this statement is without foundation in the record. As the government points out, Drake's

counsel reviewed the instruction after a conference and stated on the record that Drake did not object to the portion of the instruction he now challenges. Counsel did ask the court to add one sentence, which appears as the final line in the instruction: "You may not consider this evidence for any other purpose." We cannot agree that the court misled Drake.

Moreover, Drake did more than simply fail to object; his acceptance of the jury instruction while at the same time proposing an additional sentence unrelated to his basis for appeal could constitute waiver. *See United States v. Darif*, 446 F.3d 701, 711 (7th Cir. 2006). The government, though, has not argued waiver and so we will analyze this argument, as do the parties, under the plain-error standard. *See United States v. Pree*, 408 F.3d 855, 872 (7th Cir. 2005); *United States v. Gee*, 226 F.3d 885, 894 (7th Cir. 2000). Of course, no matter the standard, we analyze the allegedly erroneous instruction within the context of all of the instructions given to the jury to determine whether an inaccurate characterization of the law was conveyed. *See Molnar v. Booth*, 229 F.3d 593, 602 (7th Cir. 2000); *United States v. Madoch*, 149 F.3d 596, 599 (7th Cir. 1998).

Here, the instructions as a whole did not convey to the jury that it could consider Drake's prior felony convictions when deciding whether he possessed the gun, the error of law Drake asserts. Instruction 17 explained the elements of the § 922 charge:

> To sustain the charge of felon in possession of a firearm as charged in the Indictment, the government must prove the following propositions:

> First: that prior to August 27, 2002, the Defendant had been convicted of a crime that was punishable by a term of imprisonment of more than one (1) year;

> Second: that on or about August 27, 2002, the Defendant knowingly possessed a firearm, to wit: a Dan

Wesson, .357 magnum revolver, serial number 92703; and

Third: that the firearm possessed by the Defendant had traveled in or affected interstate commerce prior to defendant's possession of it on that date.

If you find from your consideration of all the evidence that each of these propositions has been proven beyond a reasonable doubt, then you should find the Defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the Defendant not guilty.

This instruction accurately describes the government's burden in a § 922(g)(1) prosecution, *see United States v. Wallace*, 280 F.3d 781, 784 (7th Cir. 2002), and thus the question is simply whether Instruction 17 is undermined by Instruction 11. Drake suggests this happened because—in closing argument—the prosecution tried to link his prior convictions to his possession of the gun:

You know, the fact of the matter is, is that when you look at all the evidence in its totality, take pieces here and pieces there, put it together, look at the circumstantial evidence, it's clear. It's no question the defendant, twice convicted felon, look at his credibility. Consider that as well, and I think you'll find, as the government has proven to you beyond a reasonable doubt, is that the defendant is guilty as charged in the Indictment.

But use of the plural "elements" in Instruction 11 did not direct the jury to consider Drake's prior felonies as evidence that he possessed the gun. And the government's closing seems only to suggest that the testimony of a "twice convicted felon" is not credible, which is a permissible inference

to draw from evidence of prior convictions, *see United States v. Montgomery*, 390 F.3d 1013*,* 1015-16 (7th Cir. 2004); *United States v. Hernandez*, 106 F.3d 737, 740 (7th Cir. 1997). If Drake really means to make an argument under Federal Rule of Evidence 404(b), the concern of that rule has nothing to do with the *elements* of the offense; the concern is that the jury will convict on the assumption that someone who committed a crime before probably is guilty now. But Instruction 11 raises no such concern; it tells the jury to limit consideration of the prior-conviction evidence to the elements of the offense, so there is no danger of misuse.

Regardless, the submission of an incorrect instruction is harmless if the jury, properly instructed, would have returned the same verdict. *See United States v. Pittman*, 418 F.3d 704, 707 (7th Cir. 2005); *United States v. Folks*, 236 F.3d 384, 390 (7th Cir. 2001). Here, there was ample evidence of Drake's guilt. Officer King testified at trial that he saw the gun in plain view at Drake's feet when he opened the Cadillac's door. Detective Wagner testified that Drake stated at the time of the stop that he had taken the gun from his sister, and Officer Melzoni testified that she recorded Drake's statement on her incident report. Though Agent Skender testified that Drake told him in an interview following his arrest that the gun belonged to another of the Cadillac's passengers and Drake attempted to disclaim his statement at the scene of the stop, the jury was left with the unequivocal testimony of three police officers and a contemporaneous incident report, all support-ing Drake's possession of the gun. The potentially erroneous instruction, given the weight of the evidence against Drake, could not have affected the jury's verdict. *See Pittman*, 418 F.3d at 708.

## C. *Paladino* Limited Remand

Finally, Drake argues that the district court committed plain error by applying the Sentencing Guidelines as mandatory prior to the Supreme Court's decision in *Booker*. The government concedes that a limited remand is appropriate because the record on appeal is not adequate to assure us that the district court would have imposed the same sentence had it known the Guidelines were advisory. We agree.

## III.

We order a LIMITED REMAND under *Paladino*, to determine whether the district court would have issued the same sentence under an advisory Guidelines regime. In all other respects, the decision of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*