In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1259

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LONNIE WHITAKER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07 CR 123—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 3, 2008—DECIDED OCTOBER 27, 2008

Before POSNER, RIPPLE and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* When Lonnie Whitaker's car was searched, a police officer found a gun. Mr. Whitaker was subsequently charged with unlawfully possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress the gun obtained from his car. The magistrate judge, after holding an evidentiary hearing, recommended that the district court deny the motion. The district court

adopted the magistrate judge's report. Mr. Whitaker pled guilty, but reserved his right to appeal the adverse decision on his suppression motion. The district court sentenced Mr. Whitaker to 41 months' imprisonment;[1] Mr. Whitaker filed a timely notice of appeal.[2] Because we believe that the district court correctly determined that the search was based on reasonable suspicion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts[3]

On June 17, 2007, shortly before 8:00 p.m., an anonymous individual called 911 to report a loud argument in a food store parking lot. The caller stated that he was unable to get close to the argument and, consequently, did not know the number of individuals involved or their genders. He did state, however, that, at the scene of the altercation, there were at least two people standing by a car, "two males, that I can see." R. 32. Later in the call, he described them as "pretty good-sized black guys." *Id.*

A second man called 911 soon after. He reported a man with a gun in the same parking lot. This second caller

---

[1]  The jurisdiction of the district court is based on 18 U.S.C. § 3231.

[2]  The jurisdiction of this court is based on 28 U.S.C. § 1291.

[3]  We base our rendition of the facts on the magistrate judge's report, which was adopted by the district court.

identified himself as "Travis" and provided the operator with a phone number. Travis stated that he had been shopping when he saw his female cousin and her boyfriend, Lonnie, arguing. Lonnie was standing next to his silver car; Travis' cousin stood next to her blue van. Travis reported that "we pulled up to ask was she all right and he pulled a gun on us!" *Id.* Travis' cousin urged them to leave, which they did. Travis then called 911.

After the first call to 911, the police dispatcher alerted units in the area. Police officers Caleb Bedford, Chad Joswiak and Becky Overland headed, each separately, toward the parking lot. As the officers were en route to the scene, "alert tones"[4] went off on the radio, and the dispatcher informed them that a second caller had reported that a black man and a black woman were arguing in a silver car in the parking lot and that the man had displayed a handgun. The officers did not know any of the other information provided by Travis.

The officers easily were able to locate a silver car parked near a van in the southwest corner of the parking lot. Officer Bedford arrived first and parked near the car, which actually was a gray Chevrolet Impala. He stepped out of his squad car and walked toward the driver's side of the Chevrolet Impala. The driver stepped out of the vehicle to face Officer Bedford. Officer Joswiak arrived and began walking toward the passenger side of the car.

---

[4] According to Officer Joswiak's testimony, an "alert tone" is a loud two-tone frequency that indicates to officers that a call came in involving weapons. R. 23 at 14.

Officer Bedford asked the man, soon identified as Lonnie Whitaker, if he and the woman were having an argument.[5] Officer Bedford saw nothing in Mr. Whitaker's hands and asked Mr. Whitaker for permission to frisk for a weapon. After receiving permission, he frisked Mr. Whitaker and found no weapon.

The female passenger, soon identified as Keisha Marsh, stepped out of the car to face Officer Joswiak. He observed that she was crying and that she had large wet circles on both shoulders of her shirt, which he presumed were from tears. Officer Joswiak asked Marsh if she and Mr. Whitaker had been arguing or fighting; she responded that they had been arguing in the car. He asked Marsh whether "everything was alright in the vehicle," and she said yes. R. 20, Ex. 2 at 6. Officer Joswiak asked Marsh if there was any problem where some type of weapon had been involved; she responded that there was not, and that there had just been an argument between her and Mr. Whitaker. When asked, she stated that she had no weapons. Officer Joswiak patted her down, but found no weapons.

Officer Joswiak announced to Marsh that he was going to do a weapons sweep of the passenger compartment of the car. Marsh said nothing but maintained her position blocking the passenger-side door. Officer Joswiak physically guided Marsh out of the way and searched the car; he found a black semiautomatic handgun in the center console. Officer Bedford then arrested Mr. Whitaker.

---

[5] The record is unclear whether Mr. Whitaker responded.

Later, after Mr. Whitaker had been conveyed to a detention facility, Officer Joswiak contacted the first 911 caller at the number listed in the records. Speaking with the first caller, Officer Joswiak was able to corroborate Mr. Whitaker's build and what he was wearing. The first caller also stated that, in addition to two men arguing, there was a third person seated in the front passenger seat of the car. Officer Joswiak was unable to reach the second caller who had identified himself as Travis, although the officer reached a voice mail box for "Smokey." Detectives later were able to locate and interview this second caller despite the fact that he had given a false name and phone number.

## II

### DISCUSSION

We review a district court's legal analysis on a motion to suppress de novo. *United States v. Riley*, 493 F.3d 803, 808 (7th Cir. 2007). Pure findings of fact, however, are reviewed for clear error. *United States v. Faison*, 195 F.3d 890, 893 (7th Cir. 1999).

### A.

Mr. Whitaker submits that the police did not have reasonable suspicion to believe that a crime had been committed. He contends that the police lacked reasonable suspicion to conduct a search of the car for weapons because the 911 caller identified as "Travis" was anonymous. He notes that Travis intended to conceal his

identity and was successful in doing so, undermining the reliability of the 911 call. Mr. Whitaker further submits that the first anonymous phone call was too vague to corroborate Travis' later call.

Mr. Whitaker further contends that the police did not observe any behavior that justified a *Terry* pat-down. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). In his view, the anonymous tip could not be a valid basis for the search because the information was not verified independently by the police. *See Florida v. J.L.*, 529 U.S. 266, 272 (2000); *Alabama v. White*, 496 U.S. 325, 332 (1990). Mr. Whitaker distinguishes this case from *United States v. Drake*, 456 F.3d 771 (7th Cir. 2006), in which the caller to 911 identified herself by her first and last name, stayed on the scene until the police arrived and provided detailed information to the operator. *Id.* at 772-74. He notes that, in this case, Travis provided a false name and phone number. He points out that Travis failed to provide a contemporaneous description of an emergency or a detailed account of the suspect car, and did not remain at the scene.

Mr. Whitaker further submits that, even if the second caller cannot be characterized as anonymous, the officers still lacked collective knowledge of the details of Travis' call at the time of the search. He acknowledges that, under the collective knowledge doctrine, law enforcement officers are considered to possess information known to other officers but not known to them. *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003) (holding that when police officers are in communication regarding a suspect, "the knowledge of one officer can be imputed to

the other officers under the collective knowledge doctrine"). Nevertheless, he submits that the doctrine does not apply to knowledge that civilian 911 operators do not share with the officers. *See United States v. Colon*, 250 F.3d 130, 137 (2d Cir. 2001) (holding that a 911 operator was not capable of determining whether reasonable suspicion existed for a stop and frisk). In Mr. Whitaker's view, at the time of the search, the officers were aware only that a man and a woman were in a silver car and that a weapon was involved. He concludes that this information was not predictive and that it therefore could not be used to establish reasonable suspicion under *J.L.*, 529 U.S. at 271-72.

The Government takes a different view. It contends that the district court was correct in determining that *J.L.* is not relevant because that case dealt with whether the initial *stop* was justified. It emphasizes that there can be two stages to a *Terry* stop: the actual stop itself and a protective pat-down search. *United States v. Brown*, 232 F.3d 589, 592 (7th Cir. 2000). Because the holding in *J.L.* is limited to an actual stop, submits the Government, the reasoning in *J.L.* is not applicable to this case; this case concerns only the legality of a search or protective sweep after a consensual encounter of the police with the defendant. *J.L.*, 529 U.S. at 274. The Government submits that the only issue is whether, under an objective test, the police officers had a reasonable suspicion that Mr. Whitaker had a gun in his possession. *Brown*, 232 F.3d at 594. In the Government's view, the district court identified "specific, articulable suspicions" that Mr. Whitaker possessed a gun. Appellee Br. at 14. When Travis called 911, he identified himself as Marsh's cousin, and

described an encounter in which Mr. Whitaker had waved him away with a handgun. This call alone, contends the Government, was enough to establish articulable suspicion. It further agrees with the district court's conclusion that the first caller provided some minimal corroboration. *See White*, 496 U.S. at 331.

The Government further submits that, contrary to Mr. Whitaker's argument, this case does not involve truly anonymous callers because the police were able to talk to both 911 callers after the fact and because Travis identified himself as Marsh's cousin. *See Drake*, 456 F.3d at 774. It also agrees with the district court that the 911 dispatcher should be considered an integral part of the investigative process for purposes of the collective knowledge doctrine.

Moreover, submits the Government, corroboration of Travis' statements occurred when the officers arrived at the parking lot, and observed the make and color of the car, its location in the parking lot, its proximity to the blue van and that two people were in the car. Marsh also confirmed that she and Mr. Whitaker had been arguing. The Government contends that her reluctance to move away from the car door gave Officer Joswiak a reason to be suspicious.

## B.

The Fourth Amendment to the Constitution of the United States prevents the Government from conducting unreasonable searches and seizures. *United States v.*

*Arvizu*, 534 U.S. 266, 273 (2002). The jurisprudence of the Supreme Court makes clear that the primary bulwark against such conduct is the procurement of a warrant from a neutral and detached magistrate. *Groh v. Ramirez*, 540 U.S. 551, 575 (2004) ("The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.") (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948) (alteration in original)). That same jurisprudence makes clear, however, that there are certain situations, defined in case law, when a warrantless search or seizure is reasonable. *See United States v. Allman*, 336 F.3d 555, 556 (7th Cir. 2003) (discussing exceptions to the warrant requirement recognized by the Supreme Court). This case involves one of those exceptions.

### 1.

We begin our analysis of the factual circumstances by examining the officers' initial encounter with Mr. Whitaker. The Government contends, and, after a hearing the magistrate judge and the district court agreed, that this initial encounter was consensual in nature and therefore did not constitute a seizure within the meaning of the Fourth Amendment. *See United States v. Scheets*, 188 F.3d 829, 836-37 (7th Cir. 1999). Whether a police-citizen encounter is consensual is a question of fact, and we

therefore review it for clear error.[6]

Upon examination of the record, we must conclude that the district court did not clearly err in reaching its decision. At the time of the encounter, Mr. Whitaker's car was parked in a food store parking lot. Officer Bedford was the first to arrive at the scene. In his report, he states that he pulled up behind the gray Chevrolet Impala; he does not mention whether he had his emergency lights on or whether his weapon was drawn. R. 20, Ex. 1. Officer Bedford stepped out of the vehicle and began to approach the driver's side of the car. At this point, Mr. Whitaker stepped out of the car and faced Officer Bedford.

Officer Joswiak and Officer Overland arrived soon afterwards.[7] Officer Bedford already was parked behind Mr. Whitaker's car on the driver's side; Officer Joswiak parked his squad car behind Mr. Whitaker's car on the

---

[6] *See United States v. Nobles*, 69 F.3d 172, 179-80 (7th Cir. 1995) (holding that whether an encounter between the police and the defendants was consensual is a question of fact); *United States v. Maldonado*, 38 F.3d 936, 939 (7th Cir. 1994) ("The question of whether a particular encounter is voluntary is a factual one, dependant on the circumstances of each case.") (quoting *United States v. Berke*, 930 F.2d 1219, 1221 (7th Cir. 1991) (internal quotations omitted)).

[7] From reviewing the record, it appears that Officer Overland remained in her squad car during the encounter. The record is unclear regarding where Officer Overland parked her squad car.

passenger side. The two squad cars were side-by-side behind the Chevrolet Impala.

A van with Marsh's children was parked next to the Chevrolet Impala. The record does not indicate whether any vehicle was parked in front of Mr. Whitaker's car, preventing him from driving away. As the officers approached the car, they did not assert their authority in a manner that fairly could be characterized as restricting the movements of Mr. Whitaker and his companion.[8] The officers did not convey, by word or action, that the occupants were to exit the vehicle. Indeed, as Officer Bedford approached, Mr. Whitaker got out of his car of his own accord to meet him.

Although neither the Supreme Court nor this court has decided a case identical in all respects to our own, some of our cases are instructive. We have held that, if a driver stops a car on his own and no other coercive activity occurs, a police encounter is consensual. *United States v. Hendricks*, 319 F.3d 993, 999-1000 (7th Cir. 2003). In *Hendricks*, a police car without its emergency lights followed a car into a gas station. The officer parked his car about fifteen feet from the car, and the occupant of the car got out and began to approach the officer. The officer radioed for backup, then got out of the car and spoke with the driver. We held that the initial encounter was consensual and that no stop had occurred until a

---

[8] The record contains no evidence that the officers had their emergency lights on or had their guns drawn.

second officer arrived with his emergency lights activated. *Id.* at 999.

Similarly, in *United States v. Clements*, 522 F.3d 790, 792 (7th Cir. 2008), the police received an anonymous tip that a car had been parked and running for four hours in front of the caller's house. Two police officers investigated. They stopped their squad car fifteen to twenty feet behind the parked car, shined a spotlight on the car and activated their emergency lights. When they approached the car, the occupant of the car raised a knife at the officers. The officers ordered him to drop the weapon and step out of the car, and when he did, a magazine containing ten cartridges of long rifle ammunition fell out of the car. We held that the district court did not plainly err in admitting the evidence.[9] *Id.* at 794. We furthermore held that the car was not seized because the driver had stopped the car voluntarily, not because of the flashing lights. *Id.* at 794-95. We emphasized that, other than flashing lights for identification and safety purposes, the officers did not do anything to make the driver feel that his freedom was restrained, such as drawing their weapons, surrounding the car with squad cars, touching the driver or using forceful language prior to the knife being displayed. *Id.*

By contrast, in *United States v. Pavelski,* 789 F.2d 485, 488-89 (7th Cir. 1986), we determined that surrounding a car on three sides constitutes a stop. In that case, a deputy

---

[9] We also held that the defendant had waived his Fourth Amendment argument. *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008). The discussion of whether the stop was consensual was an alternative holding.

was following a car when it turned into a parking lot. *Id.* at 486-87. The deputy stopped his patrol car behind the parked car, and a second officer later parked beside it. At this point, the officers had no suspicion that the driver or the other occupants had violated any laws. A third officer arrived, and parked twenty to thirty feet in front of the car.

The driver exited the car, and the deputy began questioning him. The deputy then tapped the window of the left rear passenger door, and, after the occupant lowered the window, began questioning him. *Id.* Not having reasonable suspicion but rather a "gut feeling," the officer searched the car and found weapons and various items associated with a recent bank robbery. We noted that, prior to the third squad car arriving, the car had not been subject to a *Terry* stop. *Id.* at 488. When the third patrol car parked in front of the defendant's car, however, a stop had occurred. *Id.* at 488-89. *See also United States v. Green*, 111 F.3d 515, 520 (7th Cir. 1997) (holding that where officers blocked a car's exit, the stop was not consensual); *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (holding that a stop occurred where the officers' cars were parked in front of and behind the defendant's car with the "take down" light shining through defendant's car's windows).

The question of whether this encounter was consensual in this case is a close one. However, assessing the record in its totality, we must conclude that, on this fact-bound question, the district court's decision was not clearly erroneous.

**2.**

Even if the officers' initial encounter with Mr. Whitaker cannot be characterized as consensual, we believe that the officers had the authority to stop Mr. Whitaker long enough to ascertain whether illegal activity was afoot. Any discussion of this area must begin with the Supreme Court's seminal decision in *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Supreme Court held:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30. The Court has made clear that this exception to the warrant requirement does not give an investigating officer *carte blanche* to detain an individual, even temporarily, simply because the officer believes that such action will aid his investigation. Most notably, in *J.L.*, 529 U.S. at 271-72, the Court held that the stop of an individual *solely* on the anonymous tip of an individual

usually falls beyond the bounds of reasonableness.[10] Such a tip, noted the court, simply tends to identify a particular person, but, unless it contains some prediction of future behavior that can be identified by independent investigation, there is nothing to corroborate its assertion of illegality. *Id.* Otherwise, "any person seeking to harass another [could] set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call," *id.* at 272, accusing the targeted individual of an illegality.

The situation before us today is very different from the one presented in *J.L.* Here, the 911 center received two calls in close succession that alerted the police to an *ongoing* altercation in a food store parking lot. The first call was anonymous; the second call was from an individual who gave a name and telephone number,[11] claimed to be related to one of the people involved in the altercation and said that his own intervention attempt had ended with Mr. Whitaker threatening him with a gun. At the scene, the officers found the two vehi-

---

[10] In *Florida v. J.L.*, 529 U.S. 266 (2000), the police had received an anonymous call reporting that a black man wearing a plaid shirt and standing at a particular bus stop was carrying a gun. With no other information, officers went to the location, frisked the individual and found a firearm.

[11] The record shows that the officers later discovered that the caller had given the 911 operator a false name and telephone number. However, we measure the strength of an officer's information at the time he acted. *Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004). Moreover, Travis correctly identified himself as Marsh's cousin.

cles described in the calls and two individuals in one of those vehicles. The weapon described by one of the callers was not immediately visible.

In *United States v. Drake*, 456 F.3d 771 (7th Cir. 2006), while acknowledging the strictures of *J.L.*, we noted that the reporting of an *ongoing* emergency presents special problems and obligations on the police. *Id*. at 774-75. Accordingly, we held that, when the police respond to an emergency as a result of a 911 call, the exigencies of the situation do not require further pre-response verification of the caller's identity before action is taken.

Indeed, we recently have encountered this situation in another case. In *United States v. Hicks*, 531 F.3d 555 (7th Cir. 2008), we held that the officer had reasonable suspicion to stop the defendant based on a tip which reported an ongoing emergency to 911. *Id.* at 558-59. We held that *J.L.* does not govern because the caller "gave the 911 operator enough information to identify him and his location, and because he reported an on-going emergency." *Id.* We further noted that every circuit to confront the issue had distinguished *J.L.* when the tip was "not one of general criminality, but of an ongoing emergency, or very recent criminal activity."[12] *Id.*

---

[12] *See, e.g., United States v. Brown*, 496 F.3d 1070, 1077 (10th Cir. 2007) ("[W]e conclude it was reasonable for the police to further credit the information provided in an emergency 911 call because the caller was apparently seeking protection and aid for a friend."); *United States v. Elston*, 479 F.3d 314, 319 (4th

(continued...)

---

¹² (...continued)
Cir. 2007) (holding that a "911 report, even if anonymous, bore strong indicia of reliability and alerted the police officers to a serious and imminent danger" and that "[g]iven such circumstances, the district court did not err in concluding that the officers possessed information sufficient to justify a *Terry* stop" of the defendant); *United States v. Drake*, 456 F.3d 771, 775 (7th Cir. 2006) (holding that we "presume the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, particularly when the caller identifies herself"); *United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004) ("Police delay while attempting to verify an identity or seek corroboration of a reported emergency may prove costly to public safety and undermine the 911 system's usefulness. . . . The Fourth Amendment does not require the police to conduct further pre-response verification of a 911 caller's identity where the caller reports an emergency. Accordingly, an emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality."); *United States v. Holloway*, 290 F.3d 1331, 1337-38 (11th Cir. 2002) (noting that in an emergency, "officers are compelled to search by a desire to locate victims and the need to ensure their own safety and that of the public," and holding that "in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger").

One case in the Second Circuit expresses reservations concerning whether the collective knowledge doctrine should be extended to the 911 employee who takes the call and passes on the emergency nature of the situation to police officers operating in the field. *See United States v. Colon*, 250 F.3d 130 (2d

(continued...)

(citations omitted). We further stated:

> A rule requiring a lower level of corroboration
> before conducting a stop on the basis of an emergency
> report is not simply an emergency exception to the
> rule of *J.L.* It is better understood as rooted in the
> special reliability inherent in reports of ongoing
> emergencies. Based on that special reliability, the
> Supreme Court has held that reports of ongoing

---

[12] (...continued)
Cir. 2001). The panel's misgivings in that case were based on
the training given to employees who are not police officers. *Id*.
at 135-37. Our case law, and indeed the case law of the other
circuits, has not dwelled on the same reservations. In *Drake,* we
held that 911 reports by identified callers can provide the
police with reasonable suspicion and that 911 employees are
part of the police collective. *Drake*, 456 F.3d at 775. Indeed, it
appears that the Second Circuit has modified its position and
would follow the path that we have chosen here in a case such
as this where the callers were describing events of an
emergency nature occurring as the individual reported them.
*See Anthony v. City of New York*, 339 F.3d 129, 136 (2d Cir. 2003)
("In the instant case, the call came from the same location to
which the police responded, and more importantly, the caller
described an immediate and deadly threat of harm to which
she herself was being exposed at that location. The concern
we expressed in *Kerman* regarding the reliability of anonymous
and uncorroborated calls—that is, calls reporting an emergency
at a different location and involving someone other than the
caller—is not implicated here, where the caller expressed an
immediate risk of harm to herself, and where the address
from which the call was placed was verified.").

emergencies made in 911 calls are subject to less testing in court than other out-of-court statements. Similarly, when an officer relies on an emergency report in making a stop, a lower level of corroboration is required.

*Id.* at 559-60 (internal citations omitted).

The First Circuit also has mentioned the importance of the police being able to take quick action during an ongoing emergency. In *United States v. Ruidiaz*, 529 F.3d 25, 27 (1st Cir. 2008), a 911 caller reported a shooting at or near a particular address. He noted that the individuals involved were wearing red shirts and that the shooter or shooters were in a green Mercedes-Benz parked at the address he provided. The caller confirmed the number from which he was calling, but did not provide his name and warned that he would not be on the street when the police arrived. The officers who arrived found the green car as described and noticed that it was parked in violation of two municipal ordinances. They found the defendant slumped over in the passenger seat. When they touched the man's shoulder, he screamed a profanity. The officers searched the man and found a handgun. One of the officers called the phone number provided to 911 and spoke with someone, but the person would not identify himself; nor is it clear that it was the same person. The First Circuit held that, based on a totality of the circumstances, there was reasonable suspicion for the search. *Id.* at 33. It noted that the caller confirmed his phone number and that the police knew the caller could be tracked down if he provided

false information. *Id.* at 31. In holding that the facts taken together were more than sufficient for the police to give some credence to the 911 call, the court emphasized that the call referenced an ongoing emergency. *Id.* at 31 n.2. "[R]eports about ongoing emergencies, by virtue of their very nature, necessitate quick action." *Id.*

Accordingly, the police had the right to detain the occupants of the car long enough to ascertain whether the situation described by the callers was still an ongoing threat to either of the individuals involved in the altercation or to the public.

## C.

The information obtained by the police after their arrival at the scene, when combined with the information already known to them prior to their arrival, certainly gave the officers the requisite authority to search the cabin of Mr. Whitaker's car to ascertain whether it contained a weapon. The officers' conversation with Mr. Whitaker and his companion, together with their independent observations, made it clear that the two occupants of the car were engaged in an altercation. Marsh admitted that she had been arguing with Mr. Whitaker; the officer observed that her shirt was stained with her tears and she was crying. Although Marsh denied that Mr. Whitaker had a weapon, she would not voluntarily move away from the car door when Officer Joswiak announced that he was going to search the car. All of these factors, when assessed in their totality, certainly constituted a sufficient basis to

justify the officers' inspection of the cabin for a weapon. *See United States v. Arnold,* 388 F.3d 237, 239 (7th Cir. 2004). To leave the scene at that point without having performed such an inspection could have jeopardized their own safety, as well as that of those in the surrounding area, including Marsh's children in the van parked immediately next to Mr. Whitaker's car.[13] The Fourth Amendment does not require such an unrealistic response to the situation before us.

## Conclusion

The officers had the requisite reasonable suspicion to justify their search of the passenger compartment of Mr. Whitaker's car. Therefore, the firearm found there was admissible, and the district court correctly denied the motion to suppress. Accordingly, the judgment of the district court is affirmed.

AFFIRMED

---

[13] In Officer Joswiak's testimony, he describes what drew his attention as he was entering the parking lot. He states: "As I recall, the one vehicle parked next to the silver vehicle with a van had the door open with some kids in and I mean there's the van with the kids, the silver car." R. 23 at 39. It is unclear when Officer Bedford noticed the children.