<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-4112**

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

ANDRE MCRAE, a/k/a Dre,

              Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, District Judge. (3:04-cr-00157-FDW-DCK-1)

Argued: May 14, 2009          Decided: July 6, 2009

Before AGEE, Circuit Judge, HAMILTON, Senior Circuit Judge, and C. Arlen BEAM, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Matthew Segal, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Adam Christopher Morris, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted Andre McRae (McRae) of numerous drug and firearm offenses.  He challenges several of these convictions on appeal.  We affirm.

I

Following his Spring 2004 guilty plea to federal charges unrelated to this case, McRae's best friend, Damon Chamberlain (Chamberlain), began cooperating with ATF Special Agent Terrell Tadeo (Agent Tadeo), who was investigating drug and firearm activity in the Charlotte, North Carolina area.  Through information provided by Chamberlain, Agent Tadeo learned that McRae regularly carried a .40 caliber firearm and sold both cocaine and cocaine base (crack).

On April 15, 2004, Chamberlain placed a recorded call to McRae to set up a drug deal with an undercover police officer, Detective Rolando Ortiz (Ortiz), from the Charlotte-Mecklenburg Police Department (CMPD).  In the call, McRae discussed selling marijuana and cocaine and a debt McRae owed to a drug source from the Dominican Republic.

On April 16, 2004, Ortiz contacted McRae and arranged to purchase an ounce of crack later that day at a Bi-Lo grocery store (Bi-Lo) parking lot.  Prior to the sale, Agent Tadeo and CMPD officers set up a surveillance of the parking lot.  Ortiz

and Chamberlain arrived at the Bi-Lo parking lot in Ortiz's unmarked vehicle. McRae entered Ortiz's vehicle and sold an ounce of crack to Ortiz.

Instead of arresting McRae at that time, Agent Tadeo decided to try to arrange a drug deal involving a larger amount of drugs. His attempt to arrange a larger drug deal failed, so Agent Tadeo decided to see if Chamberlain could arrange a deal involving the sale of a firearm.

On May 17, 2004, Chamberlain placed a recorded call to McRae. In the call, Chamberlain asked McRae to get him a "three pound" or .357 magnum firearm. McRae agreed to do so and proposed meeting nearby at "Shauna's house" within an hour.

At this point, Agent Tadeo gathered some CMPD street unit officers with the intention of directing these officers to stop McRae en route to Shauna's house. Agent Tadeo decided not to stop McRae himself because he did not want McRae to know that a federal investigation of his drug activities was underway. Agent Tadeo told the CMPD officers that: (1) McRae was a convicted felon; (2) he had monitored that day a conversation between McRae and Chamberlain wherein McRae agreed to furnish Chamberlain a .357 magnum firearm; (3) McRae regularly carried a .40 caliber firearm; and (4) there may be drugs in McRae's vehicle, as McRae sold crack to an undercover officer on April 16.

Two CMPD officers present at the meeting stopped McRae on his way to Shauna's house. During a search of McRae's vehicle, the officers recovered a .357 magnum firearm, a .40 caliber firearm, and a quantity of crack in excess of five grams. Marijuana was found on McRae's person.

McRae was arrested at the scene, taken into custody, and interviewed by Agent Tadeo. After waiving his Miranda rights, McRae admitted that the crack and the .40 caliber firearm were his, but denied owning the .357 magnum firearm. McRae also outlined an extensive cocaine and crack conspiracy operating in Charlotte. He identified his drug source from the Dominican Republic as "Uncle" and named some of his other drug contacts, including "Cory," "Trap," and "Pooh Bear." McRae admitted that, between February 2004 and May 17, 2004, he sold twenty-three kilograms of cocaine.

During the interview, McRae agreed to assist Agent Tadeo in gathering evidence regarding the drug conspiracy. Agent Tadeo immediately had McRae place a recorded call to Trap, whom Agent Tadeo knew from a prior federal drug investigation. In the call, McRae discussed Uncle and the quality of drugs. In fact, Trap complained about Uncle being a difficult supplier, and McRae offered to intercede on Trap's behalf.

Because McRae was showing signs of being a valuable asset, he was released on the day of his arrest with the understanding

that he would continue to cooperate with law enforcement. In the ensuing days, however, McRae completely ignored Agent Tadeo's efforts to contact him. Following the issuance of an arrest warrant, Agent Tadeo stopped McRae's vehicle on May 26, 2004. McRae fled the vehicle only to be chased down and tackled by Agent Tadeo. McRae was arrested and brought back to his vehicle. McRae's vehicle was searched by CMPD officers pursuant to both his arrest and his consent. During the search, the CMPD officers recovered a 9 mm firearm and approximately an ounce of crack.

The following day, Agent Tadeo transported McRae to his initial appearance before the United States District Court for the Western District of North Carolina. Along the way, McRae pleaded with Agent Tadeo for a second chance. Agent Tadeo decided that McRae could still provide valuable assistance in gathering evidence on the extensive drug conspiracy, so he asked the Assistant United States Attorney to seek McRae's release on bond, which the district court granted.

After McRae was released on May 27, Agent Tadeo instructed McRae to contact Uncle and set up a drug deal involving one to two kilograms of cocaine. McRae contacted Uncle, and the pair agreed to meet at the Landmark Restaurant at 3:00 p.m. At the videotaped and recorded meeting, McRae and Uncle discussed the fact that McRae owed Uncle money from a prior drug deal, but

Uncle nevertheless agreed to consummate a drug deal with McRae that night.  Uncle instructed McRae to call him around 7:30 p.m. so that they could decide upon a location for the drug deal. The deal was never consummated because McRae refused to contact Uncle that evening.

On June 29, 2004, a federal grand jury sitting in the United States District Court for the Western District of North Carolina indicted McRae on eight counts.  Count One charged McRae with conspiracy to possess with the intent to distribute five kilograms or more of cocaine and fifty grams or more of crack, 21 U.S.C. §§ 841 and 846.  Count One named Uncle and Trap, among others, as coconspirators, and alleged that the conspiracy began on or about January 1, 2004 and ended on or about May 17, 2004.  Counts Two, Three, and Six charged McRae with possession with the intent to distribute five grams or more of crack, id. § 841, relating to the crack recovered on April 16, May 17, and May 26, 2004.  Counts Four and Seven charged McRae with possession of a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c), relating to the firearm seizures on May 17 and May 26, 2004.  Counts Five and Eight charged McRae with possession of a firearm by a convicted felon, id. § 922(g), again relating to the firearm seizures on May 17 and May 26, 2004.

After McRae's indictment, Agent Tadeo met with McRae on at least two occasions. In each of these meetings, McRae described the large scale conspiracy in which he participated, changing only the drug amounts during these interviews. At a status-of-counsel hearing on December 7, 2005, however, McRae sang a completely different tune. He claimed the names of his coconspirators that he had provided to Agent Tadeo were all "make believe." McRae said he lied because he was "scared" of being "ke[pt] in jail." In light of McRae's testimony at the hearing, a superseding indictment was obtained, omitting the coconspirators' names.

Prior to trial, McRae filed a motion to suppress the evidence obtained at the May 17, 2004 stop of his vehicle, which was denied. The case proceeded to trial, and a jury convicted McRae on all counts. On December 11, 2007, he was sentenced to a total of 687 months' imprisonment. McRae received concurrent 327-month sentences on the conspiracy and the possession with the intent to distribute crack counts; two concurrent 120-month sentences on the § 922(g) counts; and consecutive sentences of sixty and 300 months on the § 924(c) counts. He noted a timely appeal.

McRae contends that the May 17, 2004 stop of his vehicle was unreasonable under the Fourth Amendment and, thus, the evidence obtained following the stop should have been suppressed by the district court.[1] According to McRae, although a traffic stop may be based on the collective knowledge of the officers involved in the investigation, an officer conducting a traffic stop can rely on information provided to him by another officer only when exigent circumstances make it impractical for the officer providing the information to effectuate the stop. Thus, McRae posits that, although Agent Tadeo could have stopped his vehicle, the CMPD officers could not.[2]

In examining a district court's ruling on a motion to suppress, we review the district court's findings of fact for clear error and its legal conclusions de novo. United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001). Moreover, the evidence must be construed in the light most favorable to the government, the prevailing party below. United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998).

---

[1] This issue relates to McRae's convictions on Counts One, Three, Four, and Five.

[2] Of note, McRae challenges only the initial stop of his vehicle, conceding that, if the stop was constitutionally permissible, the ensuing search was as well.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although a traffic stop is typically brief, it is a "seizure" within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979). Because routine traffic stops are more analogous to an investigative detention than a custodial arrest, the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968), guide this court's analysis of the reasonableness of the traffic stop. United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). Thus, we examine whether the traffic stop was "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). There must be "at least a minimal level of objective justification for making [a Terry] stop." Id. Reasonable suspicion requires more than a hunch but less than probable cause. Id. at 123-24. Moreover, under the collective knowledge doctrine (also known as the fellow officer rule), reasonable suspicion may be based on the collective knowledge of the officers involved in an

- 10 -

investigation. United States v. Hensley, 469 U.S. 221, 232 (1985). Thus, law enforcement officers cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. See United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996) ("And, although the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that Wells was a convicted felon, it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of the seizure."); see also United States v. Whitaker, 546 F.3d 902, 905 (7th Cir. 2008) (noting that, under the collective knowledge doctrine, "law enforcement officers are considered to possess information known to other officers but not known to them."); United States v. Ramirez, 473 F.3d 1026, 1037 (9th Cir. 2007) ("Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment."); United States v. Williams, 429 F.3d 767, 771-72 (8th Cir. 2005) ("[W]e also hold that the collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop [the

- 11 -

codefendant's] vehicle, and such knowledge was imputed to the officer at the scene when he received [another officer's] radioed request."); United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002) ("[T]he arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause."); cf. United States v. Ventresca, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.").

In this case, McRae does not dispute, nor could he, that Agent Tadeo had reasonable suspicion to stop his vehicle on May 17, 2004. To be sure, the following facts known to Agent Tadeo clearly supported a stop based upon reasonable suspicion: (1) McRae was a convicted felon; (2) Agent Tadeo had monitored on May 17 a conversation between McRae and Chamberlain wherein McRae agreed to furnish Chamberlain a .357 magnum firearm; (3) McRae regularly carried a .40 caliber firearm; and (4) there may be drugs in McRae's car, as McRae sold crack to an undercover officer on April 16. Thus, one officer here (Agent Tadeo) had all the reasonable suspicion components; the question then is whether that information can be imputed to the CMPD officers.

As explained above, the case law, including our own, permits such imputation under the collective knowledge doctrine.

McRae seeks to distinguish Hensley and the case law cited above on the basis that, in this case, there were no exigent circumstances present that made it impractical for Agent Tadeo to effectuate the stop himself. However, no court has engrafted an exigent circumstances requirement on the collective knowledge doctrine and to do so would make little sense. The potential abuse of the collective knowledge doctrine, in the reasonable suspicion traffic stop context, lies where the stop order is based upon nothing more than the hope that the unevaluated bits and pieces of information in the hands of several different officers may turn out to add up to reasonable suspicion. Engrafting an exigent circumstances requirement simply would not encourage officers to pool the information they have in their possession.

Moreover, Agent Tadeo understandably wanted to keep McRae from knowing that a federal drug investigation was underway. Where one officer has reasonable suspicion to effect a stop and orders another officer to do so in order to preserve the ongoing drug investigation, regardless of whether the officer possessing reasonable suspicion can effect the stop, the law enforcement interests at that point are "considerable" and the "intrusion on personal security is minimal." Hensley, 469 U.S. at 232.

In sum, there was no error in the district court's denial of McRae's motion to suppress the evidence obtained following the May 17, 2004 stop.

III

The government built its case on Count One, the drug conspiracy count, around McRae's admissions during his interviews with Agent Tadeo. In those interviews, McRae outlined his participation in an extensive drug conspiracy, with Uncle being his cocaine source. McRae's statements throughout these interviews were consistent, except that, over time, McRae reduced the drug amounts involved, which, according to Agent Tadeo, was not uncommon for a target under federal investigation who would ultimately be sentenced under the United States Sentencing Guidelines. The veracity of McRae's admissions was supported by numerous recorded phone conversations and the videotape of his meeting with Uncle on May 27, 2004, wherein the two discussed their ongoing drug dealing relationship.

McRae's defense to the government's case was that he lied during all of his conversations with Agent Tadeo about the existence of the conspiracy. According to McRae, the conspiracy was make believe, invented solely because, without the ruse, Agent Tadeo would never have sought his release following his May 17 and May 26 arrests. The problem for this defense was

- 14 -

that it necessarily required either the testimony of McRae or other proof of the conspiracy's nonexistence. As of result of his prior felony convictions, McRae declined to testify, choosing instead to demonstrate the conspiracy's nonexistence by attacking the adequacy of Agent Tadeo's investigation.

Faced with McRae's defense of attacking Agent Tadeo's investigation, the district court gave McRae substantial latitude, allowing his counsel to ask whether certain statements made by McRae to Agent Tadeo turned out to be truthful or untruthful. The district court, however, sustained the government's objection when counsel for McRae asked Agent Tadeo on cross-examination if he recalled McRae's statements of recantation made at the December 7, 2005 status-of-counsel hearing, opining that such a question would elicit hearsay testimony. Within these confines, on cross-examination, counsel for McRae was able to establish that Agent Tadeo did not pursue coconspirators named by McRae or arrest them based on things he told Agent Tadeo. During closing argument, counsel for McRae hammered this point home, arguing to the jury that Agent Tadeo could not verify any information concerning McRae's alleged coconspirators and that McRae's words were not "good enough to even arrest somebody."

On appeal, McRae contends that the district court erred when it sustained the government's hearsay objection after

counsel for McRae asked Agent Tadeo on cross-examination if he recalled the recantation statements McRae made at the December 7, 2005 status-of-counsel hearing. We review the district court's ruling for an abuse of discretion. See United States v. White, 405 F.3d 208, 212 (4th Cir. 2005) (noting that abuse of discretion standard is applied to this court's review of evidentiary rulings made by the district court).

As a general rule, hearsay is not admissible in federal courts. Fed. R. Evid. 802. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). A statement is not hearsay if it is offered for the limited purpose of explaining why a police investigation was undertaken. United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985).

In this case, the cross-examination question clearly sought to introduce into evidence an exculpatory statement made by McRae. This out-of-court statement was hearsay because the person testifying, Agent Tadeo, was not the declarant and because the statement was offered to prove the truth of the matter asserted, namely, that McRae did not confess to Agent Tadeo. McRae argues that the statement was not offered to prove the truth of the matter asserted, but it was offered for the limited purpose of showing that Agent Tadeo's investigation was

not thoroughly conducted. However, McRae's statements reveal that the investigation was not thorough only if he indeed had not confessed. Thus, the district court did not abuse its discretion by sustaining the hearsay objection to McRae's counsel's question.[3]

IV

McRae makes two related arguments concerning the expert testimony component of Agent Tadeo's testimony. First, he argues that the district court abused its discretion in permitting Agent Tadeo to testify as an expert witness to assist the jury in understanding the drug trade and all of the drug lingo used in the recorded conversations. He also argues that the district court erred in allowing Agent Tadeo to testify in a "dual role," that is, as both an expert and a fact witness.[4]

Like the testimony of a lay witness, this court reviews the district court's decision to admit expert testimony under Fed. R. Evid. 702 for an abuse of discretion. <u>United States</u> v.

---

[3] We also note that, assuming for the sake of argument the district court erred when it sustained the government's objection, any error here did not affect McRae's substantial rights. <u>See</u> Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

[4] These arguments relate to McRae's convictions on Counts One, Four, and Seven.

Wilson, 484 F.3d 267, 273 (4th Cir. 2007). The district court must be granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Id. (internal quotation marks omitted). If an expert seeks to be qualified on the basis of experience, the district court must require that he "explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." Id. at 274 (citation, alterations, and internal quotation marks omitted).

Assuming without deciding that the district court abused its discretion in permitting Agent Tadeo to provide expert testimony on the drug trade and the meaning of drug lingo, and assuming that the district court erred in allowing Agent Tadeo to testify as both an expert and a fact witness, McRae is not entitled to relief. The consequences of the improper admission of expert testimony are reviewed under the harmless error standard. United States v. Forrest, 429 F.3d 73, 81 (4th Cir. 2005). An error in admitting improper expert testimony is harmless, if viewing the record as a whole, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent the testimony. Id.

In this case, the jury would have found McRae guilty even absent Agent Tadeo's expert testimony. The main evidence

against McRae came from the physical evidence seized following his arrests and his many admissions to Agent Tadeo, post-arrest, which were consistent in all respects except for the drug amounts involved. None of McRae's admissions required expert interpretation. McRae's admissions set forth clearly and concisely his role in the offenses charged, and there is no dispute that Agent Tadeo could testify as a fact witness as to these party-opponent admissions. Moreover, McRae's admissions were corroborated by the contemporaneous phone calls conducted by McRae, which were played for the jury. The existence of such calls conclusively demonstrates that McRae was not engaging in make believe when he confessed to Agent Tadeo, and non-lingo parts of the calls showed an obvious familiarity between McRae on the one hand and Uncle and Trap on the other. Thus, they corroborated McRae's admissions without any expert interpretation at all. The district court gave appropriate cautionary instructions throughout Agent Tadeo's testimony which cured any prejudice. In short, Agent Tadeo's expert testimony played little or no role in the outcome of the trial.

V

For the reasons stated herein, the judgment of the district court is affirmed.

<u>AFFIRMED</u>